2019 IL App (1st) 182469-U

FIFTH DIVISION
December 13, 2019

No. 1-18-2469

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| H. F.-M., | ) | |
| | ) | |
|     Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 16 D 06221 |
| | ) | |
| K. M., | ) | |
| | ) | Honorable Gregory Emmett Ahern, Jr., |
|     Respondent-Appellee. | ) | Judge, presiding. |

| | | |
|---|---|---|
| K. M., | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
|     Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 16 OP 73250 |
| | ) | |
| H. F.-M., | ) | |
| | ) | Honorable William Stewart Boyd, |
|     Respondent-Appellant. | ) | Judge, presiding. |

    JUSTICE DELORT delivered the judgment of the court.
    Presiding Justice Hoffman and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1   *Held:* We dismiss as moot petitioner's appeal of the circuit court's granting of respondent's petition for an order of protection. The circuit court did not err in finding the testimony of the court-appointed psychologist more credible than that of petitioner's experts when determining the allocation of parenting time and responsibilities. The court did not deny petitioner's rights to equal protection and a fair trial. Dismissed in part; affirmed in part.

¶ 2   Petitioner H.F.-M. (wife) and respondent K.M. (husband) are the parents of the minor child S.M.[1] The couple sought to dissolve their marriage but could not agree on the allocation of parenting time. Following a trial on the issue of parenting time, the circuit court allocated sole parenting responsibilities as well as unsupervised parenting time to the husband and only supervised parenting time to the wife. The wife now appeals *pro se*, contending that the court (1) erroneously found the testimony of the court-appointed psychologist more credible than her experts' opinions, (2) erred in granting "full custody" of S.M. to husband and in granting his petition for an order of protection, and (3) denied her equal protection and a fair trial "in an affirmatively impartial tribunal." We affirm.

¶ 3                           BACKGROUND

¶ 4   This child custody and visitation case was highly contentious and exhaustively litigated. The transcript spans nearly 1,500 pages. The custody hearing took place over nearly five full court days and involved numerous experts who were meticulously examined not only by the parties, but also by the court. For the sake of brevity, this order does not contain a full recitation of the facts, but only those most crucial to our ultimate determination. Nonetheless, we have considered the entire record and all of the parties' arguments.

_____

[1] Due to the sensitive nature of the facts presented, we have used only the initials for both the parties and their child, and we refer to the parties as "wife" and "husband."

¶ 5 On May 20, 2016, the husband, on behalf of himself and S.M., filed a petition for an order of protection against his wife (case 16 OP 73250), which alleged the following. Around March 26, 2016, the wife appeared to have a "manic breakdown" while driving the family home from the airport. She nearly ran into various objects and was cursing and yelling about being insulted by her mother-in-law. She was driving extremely erratically and threatened her husband with "unknown consequences" if he took their child from her. During two weeks in May 2016, she slapped their child on the face or wrist, which caused the child to cry. The husband further stated that she took their child to a relative's house on various occasions without telling him where she was taking the child or when she would return. Later that month, she called the police to their condominium, stating that, because she noticed a car seat in her husband's car, she believed that husband would "take [their child] away 'forever.' " Then, the alarm company monitoring their condominium called him while he was at work and told him that the child's bedroom window was open. He tried unsuccessfully to contact his wife, so he called the police. She had told the police that she feared that husband was breaking though the child's bedroom door and would harm the child, so she jumped out of the child's bedroom window. The police placed the child in the care of a nearby babysitter, where the husband retrieved her. The police took the wife to St. Mary's Hospital for treatment. The circuit court granted the husband an emergency order of protection until June 10, 2016.

¶ 6 In June, the circuit court extended the emergency order of protection for about two months, allowing the wife to move back into their condominium and indicating that the husband's residence, "wherever he may reside," was also protected by the order.

¶ 7 The wife then filed her petition for dissolution of marriage (case 16 D 06221), alleging irreconcilable differences and asking to be both the "residential custodian" for the child and

solely responsible for "all major decision-making responsibilities." On July 21, 2016, the wife filed a motion to consolidate the husband's petition for an order of protection with her petition to dissolve the marriage. The court granted that motion.

¶ 8 On July 28, 2016, the circuit court ordered that, by agreement, the wife would have weekly supervised parenting time with the child for one hour on Tuesday and two hours on Saturday or Sunday. On August 4, 2016, the court further extended the order of protection to September 8, 2016.

¶ 9 About a month later, the wife filed a *pro se* motion alleging that husband had "violated his own order of protection." She stated that she found "26 links by Googling my name and DCFS [the Department of Children and Family Services]," and that she was certain that the husband (who had possession of her vehicle) or an accomplice "pulled the relays for my back lights to go out" while she had been hospitalized. She added that a mechanic stated that it had been done on purpose. She also noted that she had received *Parents* magazine but did not order it, and that she had found an antidepressant pill outside of her back door on the sidewalk.

¶ 10 The circuit court appointed a guardian *ad litem* for the child. The court extended the order of protection several times, ultimately to November 2, 2016.

¶ 11 The Hearing on the Husband's Petition for an Order of Protection

¶ 12 On November 2, 2016, the circuit court held a hearing on the husband's petition for an order of protection. As we explain below, the wife's appeal of this order is moot. However, since the wife's testimony at this hearing was explicitly adopted at the later trial on the allocation of parental responsibilities, we recite the testimony pertinent to this appeal. The wife testified that, in the early morning hours on May 19, 2016, her husband sent her a text message indicating that he had left early to go to work and asking her to feed the dog. She stated that she felt anxious after

reading that message because she believed that her husband was "up to something" other than what he wrote in the message and that she would be harmed. She had not heard her husband disarm and then re-arm their security system in their first-floor condominium and explained as follows:

"Because we have an alarm system and the alarm system is right outside of our daughter's room where I stayed that evening. I did not sleep that whole night. I was very well aware when he got up. He played the video, the intimidating video that he recorded the night before two times in our bedroom. I was intimidated then, and then he started enticing the dogs. I heard the dogs getting—like jumping like they were getting ready to be fed. That's all I can ascertain because I'm inside [S.M.'s] room and I'm trembling and I'm praying to God that he leave. I never heard the alarm disarmed and rearmed ever."

She further explained that not hearing the alarm being disarmed and rearmed caused her anxiety because an individual named "Scott" told her that her husband was still in the condominium.

¶ 13    The wife admitted, however, that, although she was fearful for her life and was "petrified" that husband was in the condominium, she did not use her cell phone to call 9-1-1; instead, she sent a text message to the neighbors upstairs asking them to call on her behalf. She said she did that because she was afraid that husband would "bust in[to] the room."

¶ 14    Shortly before 6:45 a.m. that morning, the wife began opening the windows of her daughter's bedroom because she had heard movement and the "video" playing while she was in the daughter's bedroom. When she opened the windows, the condominium alarm sounded. Believing that her husband would either hurt or kill her, she exited the condominium through the

window and then "grabbed" her daughter. She testified that her daughter was not in danger because they were on the ground floor, which was about 40 inches from the ground.

¶ 15    When asked regarding the video she had referred to, she stated that, during the prior night while she and her husband were in bed, he took out his cell phone, turned on the flashlight feature of the phone, and began recording. She recounted him saying, "I can't believe at 44 years of age she called the cops on me." She admitted having called the police on her husband at an earlier time because she feared that he would take their daughter. He then handed the phone to her, who at that point was "petrified for my life." She characterized the video as "extremely eer[ie] and intimidating." She ran into their daughter's bedroom because she believed that he would not hurt her in front of their daughter. She characterized herself as "immobile" while in the room. She locked the door.

¶ 16    When she fled the condominium through the window with their daughter, she ran to the residence of their child's babysitter. After a few minutes, the police arrived. She walked up to the officers and explained the events of the preceding night. She told them that she was afraid her husband was hiding in the back closet, which she said went "really deep" into the condominium. After the police searched and showed her that her husband was not in hiding, they suggested that she go to the hospital for a mental health evaluation, eventually taking her to St. Mary of Nazareth Hospital.

¶ 17    She then testified that on May 14, 2016, while she was walking their dogs, she noticed that her husband had a car seat installed in his car. On this fact, she concluded that her husband intended to abduct their daughter because there was already a car seat in her car, and they used only her car for their weekend grocery trips. She further believed her husband would flee with their daughter to California because she and her husband had discussed moving to California. She

then took their daughter from the condominium. She said that she was "petrified" that she and her daughter would be the subject of an "amber alert," so she contacted the police and told them she left with her daughter because of her fears. She then went to a Motel 6 in Elmhurst, Illinois.

¶ 18    While at the motel, she heard a "crazy knock" that she thought was on her door. She called a front desk staff member, who in turn contacted 9-1-1. The knocking, however, was later determined to be not on her door. She stayed at the motel that night, but the motel would not allow her to stay any longer. She then went to her father's house in Elgin and stayed several days. She went to meet with some attorneys and then returned to the condominium.

¶ 19    On May 16, 2016, she was not sleeping well, her husband was very "edgy," and their daughter was teething. Since their daughter's discomfort could not be alleviated, she decided to take her daughter "for a ride." She added that she also had to "get out of there for [her] own safety." She explained that, whenever husband would respond to her, he would to tell her to stop harassing him and would scream at her if she spoke to him. She then went to her friend, "Julie," in Rockford, Illinois. She initially testified that she did not stay at Julie's house, but then later admitted that she did stay there overnight and return to the condominium the next day.

¶ 20    She also related that she and her husband had a "tracker" or "friends app" on their phones, which caused her further anxiety because of her belief that he could use that application to find her. When asked whether she had removed that application from her phone, she responded:

> "Ironically, he took my—he stole my chargers one night, and
> I don't remember what night, so I was forced to put my iPhone in
> his alarm clock charger. The morning of [*sic*] I saw my phone next
> to my bed as normal with my charger and I discovered that he had—
> he had taken his name off of my app, and I felt extremely exploited."

¶ 21    She then testified regarding the events of March 26, 2016. The couple had just returned from visiting her mother-in-law in California. She stated that they were driving from the airport to pick up their dogs before returning to their condominium. The wife, who was driving, said that she was very angry at how her mother-in-law had spoken to her. She recalled calling her mother-in-law a "bitch" but did not recall directing any profanity at husband. According to the wife, her husband demanded that she stop the car, but she refused until he "acted like he was going to jump out." He then retrieved his bag from the back of the car. She was afraid her husband was also going to take their child with him and begged him not to do so. She denied telling him that he would suffer "consequences" if he took their daughter.

¶ 22    She acknowledged that she took her daughter to Fort Wayne, Indiana, to stay with a "friend/family member" on April 22-24, 2016, because her husband had sent her a text message stating that he "needed space." She said she became "extremely fearful" that husband was trying to "frame [her] for abuse." Specifically, she stated that "day after day," he would ask her questions about scratches on their daughter.

¶ 23    She further described her husband's hostility as "palpable." She explained that, every day, he would come home and be quiet, which she equated to him being "ticked off." He would not say hello to her and only speak to her about their daughter. She characterized this as a "huge change in his demeanor toward me," so she therefore became "petrified of him." She conceded that he did not attack or threaten her.

¶ 24    The husband's attorney then asked regarding evidence as to the husband's alleged threatening behavior.  The following colloquy took place:

"Q.  [Husband's Attorney] Did you ever see any communication in any form that indicated [the husband] wanted to cause you physical harm?

A. [Wife]  There was a text that did not state that he wanted to physically harm me, but he was implying that I was—why is it that you bite and hit [our daughter] when I just love her and kiss her and hug her?  He was framing me.

Q.  Okay.  But did that text you're referring to now, did that make you think he was going to physically attack you?

A.  I felt threatened, yes.  I felt intimidated.  I didn't know what he was capable of."

¶ 25    On cross-examination, she stated that she became aware that her husband had "etched" his name and phone number into the identification tags of their two cats (one of which had belonged to her father), while her name and phone numbers were on the tags of their dogs.  She said her anxiety was heightened because she believed this indicated the husband planned on seeking a divorce.  She said that her husband had not talked with her about getting a car seat.

¶ 26    When asked regarding her husband's alleged tampering with her computer after her hospitalization, she responded:

"A. [Wife]  Okay.  After my hospitalization, I was definitely fearful of using any electronic[s].  And it was because I had noticed

bizarre things happening on my computer as I was typing. And I took it to the Apple store like every other day—

\*\*\*

A. —and I eventually pawned my computer—

\*\*\*

A. —to just try to be rid of his harassment.

\*\*\*

A. And I changed routers. I did everything under the sun possible—

\*\*\*

A. —to try to get away and to just have privacy. And it was a very difficult time for me. Then I found 26 links on Google with my name and DCFS.

\*\*\*

A. And he's a computer—he's a programmer, and he's also in networks, and I—there is no doubt in my mind that he had everything to do with those links.

\*\*\*

A. I went to the police. I have a report. I went to the FBI. Because that is my federal right of privacy that he had violated."

¶ 27    Among the "bizarre things" she noticed on her computer were that the camera application opened without her intentionally launching it, and that the computer was overheated "after being

plugged in [while] it was on sleep mode." She determined that both were "evidence that [her] computer had been hacked." She added that they could not have been due to any other reason.

¶ 28 The husband then testified. In the evening on the May 17, 2016, he came home and began doing chores. At around 5:30 or 6 p.m., his wife returned from walking with the dogs and the child, and the police had come in with her. As the police officers approached him, they had their hands in their holsters and asked him if there was a "problem." He replied that he did not know and asked whether the house alarm had gone off. He said that he spent about 20-30 minutes with the officers before they left. The officers did not cite him with anything, place him under arrest, or suggest he leave the condominium. The officers, however, escorted his wife and their daughter to the wife's father's house, where they spent the night.

¶ 29 He then testified that, at around 9:40 p.m. the next day, he was at home in bed when his wife joined him. He admitted that he took out his cell phone and activated the flashlight and camera applications. He told his wife that he was "going to have to film *** this interaction." He explained that his wife would harass him routinely while in bed and "stoop over me and say mean things about me," such as that he was a terrible person, and demand to know why he did not agree with her about "what my mother *** was thinking." He said that she wanted to talk about that, but he did not want to because he believed it would be a long discussion, and he wanted to go to sleep.

¶ 30 The next morning, May 18, 2016, he drove to work instead of bicycling so that he could later have the tire pressure checked and run errands. He arrived at work at around 4:45 a.m., but at around 6:30 a.m., the alarm company notified him that the condominium alarm sounded. He told the representative that he would try to contact his wife to determine whether it was a false alarm. A few minutes after that call, however, the alarm company contacted him a second time

and told him that their front door had been accessed. He asked the representative to contact the police because he could not reach his wife. He then returned home.

¶ 31    As he was leaving work, a police officer called him and asked whether he was aware that wife was stating that he was "chasing" her. The husband said he was not and asked if his wife was "okay." The officer further informed him that his wife "had jumped out of the window with the baby." The officer also told him that the child was at a neighbor's house, so he went there immediately. He retrieved the child and returned to the condominium. The child's bedroom window was still open with the screen removed, a curtain rod was bent, and the bed was "disheveled." He and the child then went to the hospital to see his wife.

¶ 32    Regarding the airport incident, the husband stated that his wife insisted on driving and had been very angry with him and his mother, and that his wife was not paying attention to the road. At one point, she went over a curb and almost struck another vehicle. She was gesturing with her hands and changing lanes "quickly and erratically." He asked to be let out, but she refused until he threatened to "jump out" of the car.

¶ 33    He denied secretly manipulating "any" of his wife's electronic devices, causing the camera on her laptop computer to malfunction, or installing any programs on his wife's electronics without her knowledge. He also denied putting his hands over his ears when she would speak to him. He explained that, each time they would talk about a problem they were having, it would appear to be resolved, but his wife would yell at him about the problem again. He denied accusing her of causing the scratches to their daughter.

¶ 34    On cross-examination, he agreed that, despite the allegations in his petition that his wife had hit their child, there were no marks or bruises. He further conceded that he did not call the police or DCFS, and he still left the child alone with his wife. He also admitted that, after getting

out of the car during their drive home from the airport, he left their child in the car with his wife and did not contact police. On redirect examination, he added that he video-recorded his wife in bed in case he had to show that she was physically confronting him and due to a concern that, when she had previously told police that he was angry, the police approached him with their hands on their holsters.

¶ 35 Dr. Deborah Cano then testified for the wife as an expert in the field of psychiatry. Dr. Cano stated that she has been treating the wife since November 2013 for generalized anxiety disorder and had never noticed any signs of a psychotic disorder in the wife, even after the wife had been released from the hospital. Dr. Cano disagreed with the hospital's diagnosis that she had suffered a "psychotic disorder, not otherwise specified" because the underlying justification following the psychiatric evaluation at the hospital was that she "appeared suspicious and paranoid." Dr. Cano stated that the wife was suspicious for "a reason," which made it neither paranoid nor psychotic.

¶ 36 On cross-examination, Dr. Cano explained the basis for her conclusion that the wife was "suspicious for a reason": Dr. Cano simply stated that she "believe[s] the facts that [the wife] tells [her]," and this included the wife's allegation that the husband put something on the wife's computer and was tracking the wife. Dr. Cano, however, conceded that, in her experience, she has "no way of knowing" whether any of her patients have ever lied to her. She further admitted that it was possible that the husband did nothing "secretive" to his wife's computer.

¶ 37 Following the hearing, the court issued a plenary order of protection until November 2, 2018. In particular, the court found the husband to be "candid and *** truthful," and it stated that it was "very disturbed by [wife's] testimony." The court added that it could have granted the

husband's petition "on her testimony alone." The order allowed the wife three hours of parenting time with her child three times per week but did not require the time to be supervised.

¶ 38                  Subsequent Proceedings and the Psychological Evaluations

¶ 39     On December 6, 2016, the wife's third counsel filed a motion for a mental examination of the parties to enable the court to determine the best interests of the child and allocate "parenting time and decision-making." The motion explained that the wife's petition to dissolve her marriage was still pending and the allocation of parenting time and responsibilities were still unresolved. The circuit court appointed Dr. Phyllis Amabile to conduct the evaluation.

¶ 40     On May 10, 2017, the guardian *ad litem* filed an emergency motion for temporary supervised parenting time between the wife and the parties' child. The motion explained that, when the court granted the plenary order of protection on November 2, 2016, the wife was granted unrestricted parenting time for three hours on Wednesdays and three hours on each weekend day. The motion then noted that, on May 9, 2017, Dr. Amabile telephoned the guardian *ad litem* and stated that, based upon a review of the hospital records, the wife's parenting time with the minor child should be supervised by a responsible adult "who must be present at all time during the parenting time." The court granted the motion on the following day.

¶ 41     The wife then filed multiple *pro se* motions for substitution of judge that were denied. She retained a fifth counsel on May 17, 2018.

¶ 42                  Trial on the Allocation of Parenting Time

¶ 43     In July 2018, the court conducted a five-day trial on the allocation of parenting time. The court initially noted that financial matters with respect to the petition for dissolution of marriage had been settled and the parties had signed an agreed order. The court further confirmed that the trial would concern the "allocation judgment and the parenting plan."

¶ 44    Dr. Amabile, a practicing psychiatrist for about 35 years who was board-certified in both general and forensic psychiatry, then testified as an expert witness in the fields of psychiatry and forensic psychology.   In addition, she stated that she had testified as an expert about 100 times and has exclusively testified as a court-appointed expert since the 1990s.

¶ 45    Dr. Amabile stated that she met with both the husband and the wife twice and observed each of them alone with their child.  Dr. Amabile added that she received most of the records she had requested except for the 2007 and 2008 "intensive outpatient hospital records" from Rush University Medical Center (Rush) regarding the wife's three- or four-month stay for mental health treatment because Rush could not locate them and they were likely destroyed due to their age.  In addition, although Dr. Amabile had requested the wife's employment file from a north suburban high school, the wife indicated that she did not want to sign a release with Dr. Amabile's name on it and would instead try to obtain the file herself.   The wife, however, never provided that information.  The wife was further unable to provide Dr. Amabile with records from a psychiatrist in Evanston whom she had seen before her treatment at Rush.

¶ 46    Dr. Amabile confirmed that, around May 2017, when she arrived at her "basic conclusion and recommendations" but before submitting her final report to the court, she made an urgent call to the guardian *ad litem* because she felt that the child was at risk while in the wife's care but without "another responsible adult present * * * who could keep an eye on what was happening and on [wife's] mental state, in particular." Dr. Amabile believed that the wife was suffering from a psychosis at the time.

¶ 47    Dr. Amabile then stated that, following her examination and as noted in her final report, the wife was now suffering from a "delusional disorder, persecutory subtype" which she  defined as a fixed false belief that other people are conspiring against her, talking or laughing about her,

or trying to harm her in some way. She noted that the severity of this type of disorder will "wax and wane" over time. Dr. Amabile then recounted various incidents that supported her diagnosis.

¶ 48    In one incident, when the wife was working at a north suburban high school about ten years ago, there were no water bottles in the soda machine. Since she preferred having water with her lunch, she believed that the absence of water in the machine meant that people at the school were conspiring to make her leave the school. Another incident involved a video that had been shown at a school pep rally. The video had a segment in which a student, while carrying a baseball bat, chased a faculty member into a closet. The wife expressed her belief that the video had been shown to the student body and faculty to convey that they did not want the wife working at the school.

¶ 49    The wife began to see an unnamed psychiatrist in Evanston who thought the wife was paranoid and asked her to take an antipsychotic medication, but she refused. The wife then took a leave of absence from the high school and briefly entered an intensive outpatient program at Rush.

¶ 50    By contrast, Dr. Amabile testified that, after speaking with the husband, she concluded that he was not suffering from "any serious psychiatric disorder." Dr. Amabile further characterized the husband's parenting skills as "excellent," and she stated that she had "no major concerns" about him as a father. She recounted the husband's interview with her in which he stated that he understood the wife was suffering from a mental illness that was not her fault, and that he does not view her as "evil or bad." Dr. Amabile further noted that the husband spoke of his wish that his wife would get help so that she will improve and have more time with their daughter.

¶ 51    The battle of the experts that is at the center of this appeal then began, with Dr. Amabile's refutation of the opinions rendered by the wife's experts. She stated that diagnosis of Dr. Ndidi Onyejiaka (the wife's psychiatrist) was in error. Dr. Amabile noted that Dr. Onyejiaka failed to

speak to any "collaterals" to verify the information the wife provided. Dr. Amabile further stated that Dr. Cano's diagnosis was erroneous because, in part, Dr. Cano failed to obtain the wife's medical records. Dr. Amabile maintained her prior recommendation that the wife be allowed supervised parenting time of three hours each day for two days per week, as well as every other weekend for five hours each day.

¶ 52    Dr. Amabile further admitted that, although her written report submitted to the court stated that delusional individuals "sometimes unintentionally or intentionally harm their children," individuals without delusions sometimes also harm their children. She clarified that people with a delusional disorder are more likely to harm their child (intentionally or otherwise) than people who do not have that disorder, and that the wife's delusional disorder could have caused her to allege that her husband sexually abused their daughter.

¶ 53    With respect to the report submitted by Dr. Mary Kathleen "Molly" Pachan, Dr. Amabile stated that she had not been provided a copy of it, but she explained that Dr. Pachan's report, which consisted solely of psychological testing, could not be used to make a specific diagnosis recognized by the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V). Instead, DSM-V diagnoses are reached through a clinical diagnosis. After reviewing Dr. Pachan's report in open court, Dr. Amabile noted that the report stated that it was unclear whether the wife's fear was based in reality or exaggerated by "paranoid ideation." In addition, the report noted that the wife did not "endorse the presence of current paranoia or delusional thinking," which evidenced a reliance upon the wife's own self-report. Dr. Amabile stated that psychological testing is primarily used to help understand "something about the patient's underlying fears and conflicts," and helps more often in conducting psychotherapy or "talk therapy." She reiterated that, to make a diagnosis,

the psychiatrist should have obtained prior psychiatric treatment records and spoken to the prior providers of psychiatric treatment and not solely performed psychological testing.

¶ 54    Dr. Amabile's written report was also submitted to the court. The report recited the various incidents regarding which the husband and wife testified. The report further recounted that the wife believed that she was the victim of various "cyber harassment" attacks from her husband and mother-in-law relating to a CNN news feed on her phone, a text message that disappeared, and a listing of a childless person with the same name on a genealogy website.

¶ 55    The report noted that delusional individuals "sometimes unintentionally or intentionally harm their children," and for that reason, the wife's illness posed a "significant risk" to the wife's two-year-old daughter. According to the report, however, the husband, was an excellent father with "no serious deficits" in parenting, which the report characterized as a "tremendous blessing" for the parties' child. The report further noted that paranoid delusions are difficult to eradicate even with medication. In addition, although the wife had been actively symptomatic for about one and a half years at the time of the report, she had a history of noncompliance with her prescribed antipsychotics and refused to accept her diagnosis. The report further observed that the wife tended to "gravitate toward mental health professionals" who were not psychiatrists, did not recognize her psychosis, and were unable to treat it.

¶ 56    Dr. Onyejiaka testified on behalf of the wife as an expert in the field of psychiatry. Dr. Onyejiaka stated that she has been licensed to practice medicine in Illinois since 2014 and was board certified in general psychiatry for the previous three years. In addition, Dr. Onyejiaka stated that she had testified as an expert witness about five times during her residency in New Orleans. Dr. Onyejiaka stated that she first saw the wife in July 2017. Dr. Onyejiaka observed from her

notes that wife visited monthly until November, and then the next visit was January. She justified lengthening the visit frequency because the wife had demonstrated "clinical stability."

¶ 57    Dr. Onyejiaka stated that she had reviewed a copy of Dr. Amabile's report. Dr. Onyejiaka disagreed with several of Dr. Amabile's recommendations, including that the wife be prescribed an antipsychotic, and that seek several months of intensive psychiatric treatment in a day hospital program. Dr. Onyejiaka explained that the latter treatment was inappropriate because it would have been disruptive and unhelpful to hospitalize the wife because of "something mentioned in the past".

¶ 58    Dr. Onyejiaka opined that the wife suffered from generalized anxiety disorder and perhaps posttraumatic disorder (PTSD), but not delusional disorder. Dr. Onyejiaka stated that the wife's existing diagnosis of anxiety disorder would disqualify a diagnosis of delusional disorder. She further stated, even if the wife "comes in complaining of cyber harassment repeatedly," she would not be "actively psychotic."

¶ 59    Dr. Onyejiaka conceded that she did not read the husband's testimony from the hearing on his petition for an order of protection, nor the records from St. Mary's Hospital, records from the high school where the wife had worked. Dr. Onyejiaka also had never spoken to the husband.

¶ 60    Dr. Pachan also testified on behalf of the wife as an expert in the administration and interpretation of psychological assessments. Dr. Pachan stated that she had been a licensed psychologist for five years and was asked by Dr. Onyejiaka to perform a psychological evaluation of the wife. Dr. Pachan stated that the wife underwent a series of tests to determine if the wife had any psychological symptoms or disorders. Dr. Pachan also conducted an unstructured "intake interview" of the wife covering her background and medical and mental health history. During the interview, the wife exhibited no signs of paranoia, delusions, hallucinations, or hypomania.

The wife told Dr. Pachan that, following a custody evaluation about a year before their meeting, she became upset and concerned about her delusional disorder diagnosis.

¶ 61    Dr. Pachan said that the wife took the following psychological tests:   the Minnesota Multiphasic Personality Inventory (MMPI-2), the Millon Clinical Multiaxial Inventory (MCMI-IV), a projective drawing test, and the Behavior Assessment System for Children Parent Relationship questionnaire (BASC PRQ).   The MMPI-2 indicated that wife's scores were not elevated "on any particular mental health disorder, such as anxiety, delusional disorder, or others." The MCMI-IV, which evaluates "whether someone is trying to portray themselves in a positive or negative light," resulted in a "slight" elevation that indicated the wife had a "tendency to slightly portray herself in a favorable manner."   This test further showed moderate levels of anxiety and relationship distress.   The projective drawing test showed some anxiety or lack of confidence.   The BASC PRQ test, which was a self-reported questionnaire, indicated that the wife felt more confident than the average parent and had average levels of attachment, discipline practices, and involvement with her daughter.   Based upon these results and her interview of the wife, Dr. Pachan opined that the wife suffered from generalized anxiety disorder.

¶ 62    On cross-examination, Dr. Pachan admitted that patients of psychologists can lie or present "only part of the picture."   Dr. Pachan further admitted she never reviewed any medical or psychiatric records from any other person who treated the wife, including Dr. Onyejiaka.   Dr. Pachan stated that the information in the "historical section" of her report was obtained only from her own clinical interview of the wife.   Dr. Pachan agreed that someone could have both generalized anxiety disorder and delusional disorder because the two disorders "are not completely overlapping."

¶ 63    The wife then testified that she believed it was in the child's best interest to have "50/50" parenting time with her husband. She further stated that she would like unsupervised parenting time and the ability to make decisions in consultation with the husband on the child's education, healthcare, religion, and extracurricular matters. She said there was nothing about her mental health that would interfere with her ability to work with her husband to make these decisions for their child. She believed that her husband was harassing her either through her computer or phone. She admitted that, on March 11, 2018, she called the police during a supervised visit with her child. The supervisor was "Nancy," a former colleague of hers. She stated that, as she was getting her daughter ready to return home to her husband, her daughter said she did not want to go home. When the wife asked why, her daughter said that her husband "tickles" their daughter. The daughter then gestured to her vagina. The wife said that she immediately told Nancy, who then "came right away and asked [the child] what she told [the wife] and she repeated the exact same thing." The wife then called 9-1-1 at Nancy's suggestion. The police arrived and told the wife that DCFS would contact her, but that the wife had to return the child to her husband.

¶ 64    The wife then stated that, about a month later, there was a second time that the child "made a report" to her during another supervised visit with Nancy. Her daughter removed sunglasses that were on top of the wife's head and "used one of the sides [to] put it to her vagina." The wife said that her daughter had a "very, very weird smile" and did not say anything. The wife said she was frightened and then asked her daughter, "Who puts things in her vagina." According to the wife, her daughter replied, "Diego does." The wife explained that Diego is her daughter's stuffed animal. The wife added that the husband plays with her daughter and the stuffed animals, but acknowledged that her daughter did not make an accusation against husband. The wife then contacted police and testified that the investigation was still open at that time.

¶ 65    The wife further testified to a plethora of professional complaints which she filed against individuals whom she believed were aligned against her in the custody battle. She had filed a complaint against her husband's attorney with the Attorney Registration and Disciplinary Commission (ARDC) because she believed it was "highly unethical that he would advocate that his client be psychologically abusive and tape me without *** my consent and *** in the middle of the dark." The wife further agreed that she had filed another complaint against the husband's attorney alleging that he had a relationship with the circuit court judge "stemming from their time together *** in the state's attorney's office." The wife's prior attorney had given her that information. Although her current attorney disputed that fact, the wife had not received any other information to the contrary.

¶ 66    The wife then acknowledged that she had also filed a complaint against Dr. Butt, who was her treating physician at St. Mary's Hospital. She stated that Dr. Butt asked her to confirm that her husband "didn't lay a hand" on her after she had alleged "psychological abuse" against husband. She concluded that Dr. Butt refused to acknowledge that psychological abuse existed, which she considered highly unethical. She further disagreed with Dr. Butt's original diagnosis that she had suffered a psychotic episode when she left her condominium through her child's bedroom window out of fear that husband was there trying to kill her.

¶ 67    She also conceded that she had filed a complaint against Dr. Amabile. She believed that Dr. Amabile's diagnosis, which differed from those of her prior mental health practitioners, was "keeping me from my daughter and it's alienating me from her." She also found it highly unethical for Dr. Amabile to state in her report that the wife was a danger to her daughter when the wife had never previously harmed her daughter and never would do so. She acknowledged that in May

2016, she was the subject of an abuse and neglect report, but that in August 2016, DCFS closed their investigation as "unfounded."

¶ 68    On cross-examination, the wife recounted her own version of various incidents which were at issue, and which she strongly presses in this appeal.  Again, for the sake of brevity, we will not recount her testimony in detail. One example relates to her claim regarding an internet search of her name using the Google search engine, and her belief that her husband somehow arranged for the results to indicate that the acronym "DCFS" appeared with her maiden name.  She conceded, however, that the term "DCFS" was about 20 lines from her maiden name.

¶ 69    The circuit court then agreed with the parties' request that it take judicial notice of the wife's testimony at the hearing on the husband's petition for an order of protection.

¶ 70    Under examination by the circuit court, the wife stated that she had changed her phone eight times and her computer four times from May 2016 to the time of her testimony (July 2018) and  that she had a book of passwords that she had changed that was about one inch thick.  She nonetheless still believed her husband could hack into her computer even with a new password, because computer networks were husband's "specialty," and he could discover a computer's "IP [internet protocol] address" through "the network," which would then make it "quite easy to hack" into the computer.  When the court asked the wife for the "solid proof" that her phone was being hacked, the wife stated that the evidence was that a clerk at a Best Buy store opined to that effect, and that she called the "FBI, Secret Service, and CIA to try get remedies for this hack."

¶ 71    Gilbert Valdez then testified that he is the owner of A to Z Auto Service in Chicago. Between June and September 2016, the wife brought her car to his auto shop complaining that her taillights were not working.  Valdez stated that, when he inspected the car, he found that a relay was not in the fuse box cavity where it should have been; rather, it had been moved to an empty

cavity. Valdez added that a relay would not simply "go missing"; it had to be removed. On cross-examination, Valdez confirmed that it was impossible for the relay to have fallen behind the relay box, and he believed that someone removed it. Valdez, however, conceded that did not know that the husband had removed the relay and that anyone could have removed it.

¶ 72    Chicago police detective Lawrence Bond then testified that he was currently assigned to the children's advocacy center, where children who may have been the victim of sexual crimes are brought in for forensic interviews. Detective Bond stated that he and DCFS were involved in a currently "open" investigation regarding the parties' child and that a victim-sensitive interview of the parties' child had been video recorded "earlier this year." However, he also stated that the court should not draw a conclusion based upon the fact that the investigation was still open.

¶ 73    The husband then testified that the parties' child has lived with him since May 2016, before the court entered the plenary order of protection. He said that, although he is an M.D., he is not licensed to practice medicine. He currently works as an electronic medical records expert, which involves systems and database administration of a hospital's surgery department. He denied hacking any electronic device of the wife's or causing content to appear on a CNN website or application on the wife's phone. He also denied causing any websites to display information about his wife or to tie his wife's identity with DCFS.

¶ 74    The husband further stated that, on March 11, 2018, their daughter had been at a supervised visitation with the wife. He stated that, at some point, "the police were involved and [their daughter] was finally released there at 10 p.m. to go home with me." After that incident, their daughter had regressed in her toilet training to the extent that the pediatrician recommended "to basically start from scratch."

¶ 75    He testified that, around late June 2018, he learned that his wife had accused him of molesting their daughter. He then took the child to the child's existing pediatrician and asked her to examine their child, after which the pediatrician stated she found no evidence that the child had been molested.

¶ 76    He next explained his rationale for leaving their daughter with his wife after she had been driving recklessly home from the airport. He suspected at the time that, if he had left the car, then his wife's anger would abate. Once he had collected his luggage from the trunk of the car, he could see that his wife had changed "dramatically" and was substantially calmer. He then noted that, after around 10 minutes, he observed his wife "calmly drive out of the parking lot" (where she had let him out) and merge "gently" back into traffic. He admitted that, although he thought his wife drove recklessly home from the airport, he did not remove the child from the car and did not call the police for assistance after getting out of the car. After the airport incident, he returned home, and his wife suggested that he drive them somewhere so that they could talk. He drove the three of them until they ended up parked in a Jewel grocery store parking lot where they talked for about two and a half hours. He characterized this as a good discussion, but after returning home 30 to 45 minutes later, he referred to their discussion, and his wife looked puzzled and denied that "any such event *** occurred."

¶ 77    On October 24, 2018, the circuit court entered a judgment dissolving the parties' marriage. The judgment order provided that a separate judgment order for "Allocation of Parenting Responsibilities" was entered separately but incorporated in the dissolution order by reference. The separate order allocating parenting responsibilities noted that a trial was held, and that the court found Dr. Amabile's testimony and report credible, but it discredited the testimony of Dr. Onyejiaka. The court noted that the testimony of the wife's two experts (Drs. Onyejiaka and

Pachan), conflicted, and their testimony revealed that they were unfamiliar with certain events which the wife considered to be significant. The court further noted that the wife subjected the child to "unnecessary questioning and examination" in connection with two allegations of sexual molestation, allegedly perpetrated by the husband. The court noted that one of the allegations resulted in a victim-sensitive interview that the court viewed[2] and found to be "absent [of] any indication that the child had been sexually abused." The court allocated decision-making responsibilities concerning the child's education, health, religion, and extracurricular activities solely to the husband. The court then allocated supervised parenting time to the wife each Tuesday and Thursday from 5:15 p.m. to 8:15 pm. and alternating weekends (Saturday and Sunday) from 1 p.m. to 6 p.m. The court specifically ordered that all of the wife's parenting time be supervised until further order of the court and that the wife would not have parenting time if a supervisor is not present. This appeal, which encompasses both the plenary order of protection and the main allocation of parental responsibilities trial, followed.

¶ 78                                  ANALYSIS

¶ 79    On appeal, the wife contends that the circuit court erred in (1) granting her husband's petition for an order of protection, which she asserts resulted in her husband obtaining "full custody" of S.M.; (2) finding the testimony of Dr. Amabile (the court-appointed expert) more credible than her experts' opinions; and (3) denying her equal protection of the law and a fair trial "in an affirmatively impartial tribunal."

¶ 80    At the outset, we must briefly discuss the timing of this appeal. When this case was assigned for disposition, a review of the briefs and the record indicated that the appeal largely concerned allocation of parental responsibilities. Therefore, under Illinois Supreme Court Rule

_____

[2] The recording of this victim-sensitive interview was not included in the record on appeal.

311(a)(5) (eff. July 1, 2018), this court must issue its decision within 150 days of filing the notice of appeal. Under this rule, our decision was due on April 18, 2019. Rule 311(a)(8) further states that extensions (or "continuances") for these appeals are disfavored and granted only for compelling circumstances. S. Ct. R. 311(a)(8) (eff. July 1, 2018). Although the wife properly identified this appeal as subject to accelerated disposition in the docketing statement and on her brief, she did not include the special caption required by Rule 311(a)(1) on the notice of appeal. Consequently, the clerk did not set this appeal on the accelerated docket, which enabled the *pro se* parties to seek numerous extensions of time to file their respective briefs. Nonetheless, the case is now fully briefed, and on October 1, 2019, we entered an order directing the clerk of this court to place this appeal on the accelerated docket.

¶ 81    We further note that the wife's *pro se* brief does not comport with our supreme court rules. The statement of facts consists of fewer than three pages, whereas the record on appeal in this case consists of nearly 1,400 pages in testimony and 600 pages of documents (including the 48-page court-appointed psychiatrist's report). Supreme Court Rule 341 requires that an appellant provide "facts necessary to an understanding of the case." Ill. S. Ct. R. 341(h)(6) (eff. May 25, 2018). The wife's statement of facts, even taking into account that it was submitted *pro se* , is so inadequate that it resulted in an unnecessary delay in resolving the important issues raised in this appeal.

¶ 82    Supreme court rules are not mere suggestions; they are rules that must be followed. *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57. Moreover, it is a deep-rooted principle that a litigant appearing in this court *pro se* must follow the same rules as a litigant represented by counsel. *In re Marriage of Winters*, 160 Ill. App. 3d 277, 281 (1987) (citing *Biggs v. Spader*, 411 Ill. 42 (1951)). We have the inherent authority to dismiss an appeal if an appellant's brief fails to comply with supreme court rules. *Epstein v. Galuska*, 362 Ill. App. 3d 36, 42 (2005).

¶ 83    Nonetheless, we recognize that striking a brief for failure to comply with supreme court rules is a harsh sanction. *In re Detention of Powell*, 217 Ill.2d 123, 132 (2005); *People v. Thomas*, 364 Ill. App. 3d 91, 97 (2006).  Further, the wife has made some attempt to comply with the rules, and the record and briefs provide enough information as to the nature of this case and the issues raised on appeal.  Therefore, based upon our review, and because this appeal concerns parental visitation rights and the allocation of parental responsibilities, we decline to find forfeiture and will consider this appeal on the merits.  See *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 10 (reviewing the merits despite substantial Rule 341 violations).

¶ 84    The wife first contends that the circuit court erroneously granted her husband's petition for an order of protection, resulting in the husband gaining "full custody" of their child. Although this issue was raised in the wife's brief, she did not indicate in her notice of appeal that she was appealing from this order.  Instead, she only listed the judgment order dissolving the parties' marriage and allocating parental responsibilities.  Furthermore, this issue is moot because the plenary order of protection expired in November 2018, and there is nothing in the record to indicate that the plenary order was extended.  We, therefore, will not consider the wife's claim of error with respect to the order of protection.

¶ 85    We next review the wife's claims of error regarding the allocation of parental responsibilities trial.  She contends that the circuit court erred in finding the testimony of Dr. Amabile (the court-appointed expert) more credible than her experts' opinions when it allocated parental responsibilities and visitation.  She argues that the court improperly disregarded the opinion of her three experts (Drs. Cano,[3] Pachan, and Onyejiaka) in favor of Dr. Amabile.  She

---

[3] Although the wife includes Dr. Cano, we note that Dr. Cano only testified at the hearing on the order of protection and not at the trial for the allocation of parental responsibilities. Accordingly, we will not consider Dr. Cano's testimony.

argues that Dr. Amabile's assessment was merely "short-term" and made two years before trial during an "intense emotional period," whereas her three expert witnesses had treated her over several months leading up to the trial in 2018.

¶ 86    She argues that a manifest weight of the evidence standard of review applies; however, she is not appealing from the denial of a petition to modify a custody judgment where such a standard applies.  See *In re Marriage of Cotton*, 103 Ill. 2d 346, 356 (1984).  Rather, this case involves review of the custody judgment itself.  "Determining custody in a particular case is a matter which rests with the sound discretion of the trial court."  *Department of Public Aid ex rel. Davis v. Brewer*, 183 Ill. 2d 540, 557 (1998).  Accordingly, we will not disturb the circuit court's determination unless it has abused its discretion.  The abuse of discretion standard of review is "the most deferential standard of review—next to no review at all."  *In re D.T.*, 212 Ill. 2d 347, 356 (2004).  Our supreme court has explained that "[a] custody determination, in particular, is afforded great deference because the trial court is in a superior position to judge the credibility of the witnesses and determine the best interests of the child."  (Internal quotations marks omitted.)  *In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004).  In fact, the trial court may even disregard uncontradicted testimony if it is inherently unreasonable or improbable.  *In re Marriage of Elies*, 248 Ill. App. 3d 1052, 1058 (1993).  Therefore, a court abuses its discretion only when its decision is "arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court."  *In re Marriage of Lindman*, 356 Ill. App. 3d 462, 467 (2005).

¶ 87    In this case, there was no abuse of discretion.  Even when viewed through the lens of the cold record, the wife's experts were far less credible than the court-appointed expert, Dr. Amabile. Dr. Pachan reviewed none of wife's prior medical records.  Instead, Dr. Pachan relied solely on whatever the wife told her.  Dr. Pachan, however, freely admitted that psychiatric patients can lie

to or withhold material facts from their psychiatrists, and she conceded that speaking to collaterals can provide useful diagnostic information even if a patient sincerely seeks an accurate diagnosis.

¶ 88     Dr. Onyejiaka stated that she did review Dr. Amabile's report but failed to conduct any investigation as to the wife's prior treatment or speak with any collaterals, who could have revealed information that Dr. Amabile did not obtain.  Dr. Onyejiaka insisted the wife only suffered from generalized anxiety disorder (and "possibly" PTSD), but pointedly failed to locate where in the DSM-V the presence of anxiety precludes a diagnosis of delusional disorder.[4]  The wife's other expert, Dr. Pachan, squarely contradicted this assertion, agreeing on cross-examination that both disorders can be "comorbid," or present at the same time.

¶ 89     By contrast, Dr. Amabile's single-spaced 48-page report was exhaustive.  She investigated the wife's prior medical records (to the extent they were provided to her).  She interviewed the wife, husband, as well as the wife's prior treaters and other "collaterals."  She also separately observed how each parent individually interacted with their child.  We further note that Dr. Amabile's statement that delusional episodes will "wax and wane" appears to be consistent with the DSM-V's notation that, after a one-year duration of the disorder, episodes should be described as in "acute episode" (when "symptom criteria" are fulfilled), "partial remission" (when symptom criteria are only partially fulfilled), and "full remission" (when "no disorder-specific symptoms are present").  See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 91 (5th ed. 2013).

---

[4] We note that, under the "Differential Diagnosis" subsection of the "Generalized Anxiety Disorder" section of the DSM-V, it states, "Generalized anxiety/worry is a common associated feature of depressive, bipolar, and *psychotic disorders* [such as delusional disorder] and should not be diagnosed separately if the excessive worry has occurred only during the course of these conditions."  Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 225-26 (5th ed. 2013).

¶ 90    Moreover, Dr. Onyejiaka's claim that Dr. Amabile's report was biased is unsupported by the evidence.  Dr. Onyejiaka's bias claim is based upon (1) Dr. Amabile's use of exclamation points to describe an interviewee's emotionally charged statement and (2) Dr. Amabile's description of the husband's parenting as a "blessing" to their child and Dr. Amabile's reporting that husband did not view the wife as "bad or evil."  We are puzzled as to how precisely Dr. Amabile's choice of punctuation betrays bias.  Furthermore, the statement that the husband's *parenting* only was a blessing for the child does not indicate a bias in favor of the husband.  Finally, the statement that the husband does not view the wife as bad or evil merely supports Dr. Amabile's conclusion that the husband shows compassion and understanding that the wife's mental illness is not the wife's fault.

¶ 91    On these facts, the circuit court's decision was not "arbitrary, fanciful, or unreasonable," nor is it one that no reasonable person would adopt.  See *Lindman*, 356 Ill. App. 3d at 467.  We emphasize that it is not this court's role to second-guess a circuit court's resolution of conflicts between contradictory witnesses.  *Bates*, 212 Ill. 2d at 515.  Additionally, the mere quantity of witnesses for one side does not prevent a court from disregarding them if it believes the other side's witnesses are more credible.  *Lange v. Freund*, 367 Ill. App. 3d 641, 645 (2006).  Consequently, the court did not abuse its discretion, and we must reject the wife's claim of error.

¶ 92    Finally, the wife asserts that she was not afforded a fair trial in an "affirmatively impartial tribunal" and that she was denied equal protection.  Her contention of error is far from clear.  She seems to claim that "ACF" (this acronym is undefined) reimburses the state for child support enforcement expenses and provides various grants.  She then appears to conclude that circuit court judges have "a pecuniary interest in restricting custody so as to justify [the wife's] [child] support obligation."  This claim fails for multiple reasons.

¶ 93    First, the wife never made any such claim before the circuit court.  This issue is therefore forfeited.  See *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996) ("It is well settled that issues not raised in the trial court are deemed waived and may not be raised for the first time on appeal.").  The circuit court judge's salary is set by state law and does not vary based on revenues from outside sources.  See Ill. Const. (1970) art. VI, sec. 14.  This claim is thus meritless.

¶ 94                                    CONCLUSION

¶ 95    We dismiss as moot petitioner's appeal of the circuit court's granting of respondent's petition for an order of protection.  In addition, the court did not err in finding the testimony of the court-appointed psychologist more credible than that of petitioner's experts when determining the allocation of parenting time and responsibilities.  Accordingly, its allocation of parental responsibilities did not constitute an abuse of discretion.  Finally, the court did not deny petitioner's rights to equal protection and a fair trial.  Accordingly, we dismiss in part and affirm in part the judgments of the court below.

¶ 96    Dismissed in part; affirmed in part.