(No. 58813.—

*In re* MARRIAGE OF CLAUDIA COTTON, Appellee, and JACKIE COTTON, Appellant.

*Opinion filed October 3, 1984.*

Frank Celani and Gerald W. Korey, of Lansing, for appellant.

Vincent F. Vitullo, of Chicago, and John L. Cifelli & Associates, Ltd., of Chicago Heights, for appellee.

JUSTICE CLARK delivered the opinion of the court:

This appeal requires us to determine whether the trial judge abused his discretion when he modified a child-custody decree after the divorce decree had become final. More specifically, we are asked to decide if the evidence of neglect and child abuse was sufficient to warrant a change in custody of the parties' three-year-old daughter from the mother to the father.

Claudia and Jackie Cotton were married on November 16, 1974, and Christy Cotton was born on February 29, 1978. Claudia and Jackie were divorced on September 26, 1979, and Claudia was given custody of Christy. On April 22, 1981, Jackie obtained an emergency order from the circuit court of Cook County that gave temporary custody to Jackie's sister, Pamela Mitchell. On February 25, 1982, the trial judge ruled that permanent custody of Christy should be transferred from Claudia to Jackie, and Claudia appealed. The appellate court, in a Rule 23 order (114 Ill. App. 3d 1150), reversed the trial judge and ordered that Claudia should have custody of Christy. We granted Jackie's petition for leave to appeal (87 Ill. 2d R. 315(a)).

Three issues are presented in this appeal: (1) Was the decision of the trial court against the manifest weight of the evidence? (2) Did the appellate court properly reverse the trial court without remanding the cause for a new hearing? (3) Did the trial judge properly order Jackie Cotton to pay a portion of Claudia Cotton's attorney fees?

After Jackie and Claudia obtained their divorce,

Christy continued to reside with Claudia in the Cotton residence in Dolton, Illinois. Jackie remarried after he moved to Nashville, Tennessee, to pursue his career as a musician. In December of 1980, Claudia met a man named David Kaleno at "Mugs," a bar in the Hegewisch neighborhood of Chicago's south side. Claudia fell in love with David and had intentions of marrying him. David began staying overnight at Claudia's house and on one occasion stayed there for two consecutive weeks. Since David was unemployed, he often watched Christy when Claudia went to work.

On March 30, 1981, David looked after Christy while Claudia was at work. When Claudia returned, she discovered that the child's neck had been injured. Christy had several red parallel scratch marks on the back of her neck. Claudia testified that David told her the injury was caused by a rug burn. David explained that he had been carrying Christie when they fell down the stairs and that was how the rug burn occurred.

On March 31, 1981, Claudia and David took Christy and Megan Ecklund, a neighbor's child, to the zoo. Neighbor Candy Ecklund, Megan's mother, was alarmed at Christy's neck injury, and Candy questioned Claudia about David's treatment of Christy. Claudia explained that Christy and David had fallen down the stairs and that is how the neck injury occurred. Candy Ecklund told Claudia that Christy's neck "looked bad," but Claudia did not seek medical attention for the injury. Claudia went to work that evening and noticed an injury to Christy's finger when she returned. Claudia did not take Christy to the doctor or admonish David for Christy's injuries.

On April 1, 1981, Claudia noticed three circular wounds on the soles of Christy's feet but again took no action. Dr. Sashi Paul, the child's pediatrician, examined the child on May 4, 1981, when she was brought in by

Pamela Mitchell and determined that the foot wounds were caused by cigarette burns. Claudia testified that she smoked cigarettes but that David did not smoke.

Pamela called Claudia on April 12, 1981, and asked if she could take Christy for an overnight visit. Claudia refused permission, and Pamela was puzzled because she had taken Christy for overnight visits several times in the past. Pamela and her friend, Jennifer Farmer, visited the Cotton residence on April 14, 1981, and discovered that David was baby-sitting in Claudia's absence. Claudia returned home after Pamela and Jennifer had left. Claudia testified that she told David that he should not baby-sit any more because "something happened that night." There is no evidence of what happened that night or what Claudia was referring to when she made that comment.

On April 15, 1981, Pamela was permitted to take Christy for a day visit. Claudia told Pamela that Christy could not roller skate because of "blisters" on her feet. Pamela, Jennifer, and Christy visited Christy's grandfather, and returned to the Cotton residence. During the course of the day, Christy had complained that her back hurt. Claudia examined the child to see what was causing her discomfort. Pamela testified that Claudia lifted the child's shirt and Claudia saw a long burn mark on her back. The wound appeared covered with scar tissue.

Pamela baby-sat for Christy on April 17, 1981, and photographed Christy's neck and back wounds. Pamela contacted Jackie in Nashville, and Jackie contacted his lawyer in order to have Christy removed from Claudia's custody. Jackie went to the Cotton residence with Jack Thompson, a police officer on the Dolton police force. The two men examined Christy in Claudia's presence, and Officer Thompson testified that Claudia seemed surprised when they discovered the ugly wound on the child's back. Claudia said that she was unaware of the

injury and said that David must be responsible for it. Christy was taken to the emergency room of St. Margaret's Hospital, and Officer Thompson took photographs of the injuries. Christy was examined by Dr. Paul on May 4, 1981, and Dr. Janice Mendelsohn on May 12, 1981. As we said previously, on April 22, 1981, an emergency order was issued by a trial judge in the circuit court of Cook County, and Pamela was given temporary custody of Christy. Claudia allowed Christy to be moved to Nashville so she could live with Jackie pending the outcome of the custody hearing.

Dr. Paul testified that Christy had a large area of healed scar tissue on her back, marks on her neck, right leg and right knee, and three circular wounds on her feet. Dr. Paul testified that the wounds were not accidental, and could have caused deformity or severe infection. Possible complications from such wounds included infection, scars and contracture deformity.

Dr. Janice Mendelsohn testified as an expert witness without compensation. She testified that she is the chief of the Child Protective Services system at the University of Chicago. She further testified that she had seen thousands of children that had been victims of child abuse, and had treated scratches, burns, blisters, rug burns, and cigarette burns. Dr. Mendelsohn stated that Christy's neck injury was caused by human fingernails, and that the child's back injury was caused by a burn. Dr. Mendelsohn testified that Christy had been a victim of child abuse, and that possible complications of the wounds included infection and scar formation.

Christy lived in Nashville with Jackie and his second wife, Tracy, in the year preceding the custody hearing. Christy had completely adjusted to her new home in Nashville and testimony elicited at the hearing verified Jackie's contention that the Nashville home provided a good environment for the child. Jackie and Tracy were

solicitous of the child's needs and saw that Christy was involved in neighborhood and church activities. Extensive character testimony established that Tracy Cotton was an excellent mother and that Christy appeared happy in her new home.

No other orders were issued by the trial court concerning the custody issue between the April 22, 1981, emergency order and the final custody modification that is the basis for this appeal. Christy was moved to Nashville shortly after the emergency order of April 22, 1981. She was fully integrated into the family, and had started attending preschool classes. Christy was given eyeglasses after Jackie detected that the child's eyes were slightly crossed. The deposition of Dr. Gates Jordan Wayburn, an ophthalmologist, was read into the record during the trial. Dr. Wayburn believed that Christy's eye disorder could have led to permanent eye damage if it had not been treated at a young age and said that he had treated Jackie for the same condition in October of 1980, and that it was hereditary. Dr. Wayburn stated that the condition was visible to the naked eye, and that he did not know how long the condition had been present, that it usually occurred between two and three years of age, and that the child would not complain because of it. Claudia never took Christy to an eye doctor or had the eye disorder treated during the years she had custody of Christy. Claudia knew or should have known of Christy's eye problem but did nothing to correct it.

The precise cause of Christy's neck and back wounds was the subject of a great deal of testimony at trial. Dr. Kent Kyger, a child psychologist in Nashville, Tennessee, examined Christy to determine the cause of her injuries, and his deposition was read into the record at the trial. Christy told him she kept having nightmares about "bad people in Dolton." Christy also told Dr. Kyger that David had caught her playing with Claudia's makeup and

that David had lit a broom on the stove and burned her with it. Christy told Dr. Kyger that Claudia had not beaten her or burned her, but that "bad people in Dolton did." Dr. Kyger stated that Christy had experienced nightmares over the broom-burning incident.

When Claudia was deposed by Jackie's attorney, she stated that Christy's wounds were not serious. When she made this statement, she was not aware that Pamela and Officer Thompson had photographed Christy. When Claudia was shown enlargements of the photos in court, she stated that she did not remember the wounds to be that serious. Claudia testified that she did not take Christy to the doctor or seek medical advice for Christy's neck, back and foot injuries.

Claudia testified that she loved Christy very much and wanted to have custody of her, and stated that she was a very religious woman and that Christy would be raised in a Christian environment. She acknowledged that she continued to see David Kaleno until June of 1981, two months after the emergency order that deprived her of custody of Christy. Claudia stated that she no longer took librium, the tranquilizer she had been taking during the time Christy was burned and scratched.

At trial, a great deal of character evidence was produced concerning Claudia's character. Jackie's statements epitomized this testimony. Jackie refused to say a word against Claudia, and he stated that Claudia was an honest woman and a fine mother. Jackie stated: "*** I'm not concerned with Claudia. I'm concerned with the welfare of my daughter. I would like custody of her to make sure that nothing of this matter [sic] happens to her again."

The trial judge gave Jackie custody of Christy, with liberal visitation rights, including summer vacation and many holidays, to Claudia. The judge stated:

"One of the hardest things we have to do is decide matters of this kind. Custody is one of the most difficult things we have to deal with because we know that both parents love their children and that the children love the parents.

\* \* \*

We take notice that Claudia has acknowledged that David lived with her for at least a period of two weeks, but that we're not—people can always forgive. The question is whether little Christie forgets."

The judge termed the case "a horrible episode of child abuse" and concluded:

"Claudia did not want it and she certainly does not condone it, although her testimony was after that was all over, she still hoped to marry David and which would have been her right except that it does seem to me that—being that she was blinded by the fog of love or maybe she was, but it indicated that although I know that she feels in her heart now that her daughter means more than David Calino or anyone else, I mentioned a moment ago that the statute requires us to find that there was a dangerous environment. I don't find that. I don't want to find that and I do not find either party unfit.

What we have to do now under the present Act if we're going to do any change of custody, the Court shall not modify a prior custody judgment unless it finds by clear and convincing evidence upon the basis of facts that there have arisen since the prior judgment or that were unknown to The Court at the time of the prior judgment that a change has occurred and the circumstances of the child or her custodian and that the modification is necessary to serve the best interest of the child.

It's the bottom line. That's the rule that we follow. We now have to follow the rule as to what is the best interest of Christina." (We note that Claudia's boyfriend's name was spelled "Kaleno" and "Calino" in the record and the briefs. Since he did not testify at the hearing, we are unable to verify the precise spelling of his name.)

We turn now to the first issue presented for review:

Was the decision of the trial court against the manifest weight of the evidence? We begin by noting that the trial court is in the best position to review the evidence and to weigh the credibility of the witnesses. (See *In re Marriage of Thompson* (1983), 96 Ill. 2d 67, 78-79.) It is not necessary to find one parent unfit to justify a custody ruling in favor of the other parent. (*In re Marriage of Macaluso* (1982), 110 Ill. App. 3d 838, 843.) The guiding principle in child custody cases is the best interests of the child. (*Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, 345; *In re Marriage of Thompson* (1983), 96 Ill. 2d 67, 78.) The criteria for resolving custody disputes can be found in section 610(b) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 610(b)), which provides, in pertinent part:

> "(b) The court shall not modify a prior custody judgment unless it finds, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child. In applying these standards the court shall retain the custodian appointed pursuant to the prior judgment unless:
>
> (1) the custodian agrees to the modification;
>
> (2) the child has been integrated into the family of the petitioner with the consent of the custodian; or
>
> (3) the child's present environment endangers seriously his physical, mental, moral or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him." Ill. Rev. Stat. 1977, ch. 40, par. 610(b).

Since the case at bar involved an acrimonious trial that lasted 11 days, the first two criteria could not justify a change in the custody of the child. We must examine the evidence and the trial court's decision to determine if the change in custody could be justified under

subparagraph 3, involving a dangerous environment for the child.

In this case, the trial judge transferred legal custody from Claudia to Jackie by means of a verbal order which he later reduced to a written order at the conclusion of the hearing. The order was extemporaneous, and does not precisely conform to any of the three criteria set forth in section 610(b). The trial judge termed the case "a horrible episode of child abuse" and made the following statement a few sentences later:

"I mentioned a moment ago that the statute requires us to find that there was a dangerous environment. I don't find that. I don't want to find that and I do not find either party unfit."

The trial judge concluded by saying:

"I must find on the basis of all the evidence *** based on the guidelines given to me by the statute and by the preponderance of the evidence, I feel that custody in Jack Cotton should continue."

We are asked to review a somewhat contradictory order: The trial judge termed the case a horrible episode of child abuse yet said that he did not want to term it a dangerous environment. He stated that the statutory guidelines convinced him that the best interests of the child would be served if custody were given to Jackie and not Claudia.

This court considered a similar discrepancy in *In re Custody of Harne* (1979), 77 Ill. 2d 414. In *Harne*, this court held that a trial judge must make specific findings under section 610(b) in order to modify a prior custody decree. The court noted:

"Having determined that section 610(b) requires a trial judge to make explicit findings that either subsection (1), (2) or (3) is applicable prior to modifying a custody judgment, we consider whether this requirement was satisfied here. We believe that it was. Although the

trial judge did not articulate the necessary finding at the conclusion of the hearing \*\*\* he did make the necessary finding in his written order and also in response to the intervenors' motion for reconsideration. \*\*\* The trial judge found that '\*\*\* the Court finds that it is in the best interests of the minor children that the Petitioner have their care custody and control.' \*\*\* Consequently, although we agree with the appellate court's conclusion that specific findings on subsections (1), (2) or (3) are required, we disagree with its determination that the trial court findings in the present case were inadequate." 77 Ill. 2d 414, 421-22.

In the case at bar, we believe that the language of the trial judge conforms with the requirements of the *Harne* decision. Although there is some ambiguity in the extemporaneous order given at the conclusion of the trial, we believe that the trial judge made specific findings in conformity with the *Harne* decision:

"MR. CHUDADA [Claudia's attorney]: Judge, I'd ask you to make specific findings as part of the Court order, if you would be so kind to do so...

THE COURT: The specific findings are that, the exact language of Section 610, subsection B, that the Court finds by a clear and convincing evidence and by a preponderance of the evidence upon the basis of the facts that have arisen since the prior judgment... there has been a change of circumstances that has occurred since. That makes the modification necessary to serve the best interests of Christina."

Similar language was incorporated into the written order entered February 25, 1982, that gave Jackie custody of Christy. We believe that the trial judge's decision was not against the manifest weight of the evidence. The record clearly shows that Claudia did not act to protect Christy from serious physical abuse extending over a period of two weeks. She did not seek medical attention for the wounds even though she knew of their severity as early as April 15, 1981, when Pamela and Claudia exam-

ined the burn on Christy's back. Claudia pretended she did not know of the injury when Officer Thompson and Jackie came to remove Christy on April 22, 1981. Claudia neglected the health of the child and did not detect or seek medical attention for an eye disorder that could have done permanent damage to Christy's eyesight. There was sufficient evidence to justify the trial court's view that Christy had been the victim of serious child abuse and that it was in the best interests of the child to modify the custody decree. See *In re Custody of Sexton* (1981), 84 Ill. 2d 312; see generally Klaff, *The Tender Years Doctrine: A Defense*, 70 Cal. L. Rev. 335 (1982); Note, *Child Custody: Parental Cohabitational Relationships and the Best Interest of the Child Standard—Jarrett v. Jarrett*, 29 DePaul L. Rev. 1141 (1980).

In the case at bar, the judge's language stating that there was no dangerous environment was at variance with the description of "a horrible episode of child abuse" as well as the specific findings in accordance with section 610(b). The isolated statement concerning the dangerous environment does not alter the general verdict on the question of custody. (See *Lespereance v. Wolff* (1979), 79 Ill. App. 3d 136, 139.) We therefore conclude that the trial judge's decision was not against the manifest weight of the evidence.

We turn now to the second issue raised in this appeal, whether the appellate court properly reversed the decision of the trial court without ordering a new hearing. Jackie contends that the appellate court was not justified in overturning the verdict of the trial court without remanding the cause for a new hearing. (*Cf. Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494; *Mizowek v. De Franco* (1976), 64 Ill. 2d 303; *In re Custody of Ehr* (1979), 77 Ill. App. 3d 540.) Since we have determined that the decision of the trial court was not against the manifest weight of the evidence, we need not decide

whether the appellate court should have reversed without a remand or ordered a new hearing. Since the record supports a change in custody from Claudia to Jackie, the decision of the trial court should stand.

The last issue we will address is whether the trial judge properly ordered Jackie to pay a portion of the attorney fees incurred by Claudia. Under section 508(a) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 508(a)), a trial judge has the authority to make such a determination. Section 508(a) provides in pertinent part:

> "The court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order either spouse to pay a reasonable amount for his own costs and attorney's fees and for the costs and attorney's fees necessarily incurred by the other spouse, which award shall be made in connection with the following:
>
> (1) The maintenance or defense of any proceeding under this Act.
>
> (2) The enforcement or modification of any order or judgment under this Act.
>
> (3) The defense of an appeal of any order or judgment under this Act, including the defense of appeals of post-judgment orders.
>
> (4) The maintenance or defense of a petition brought under Section 72 of the Civil Practice Act seeking relief from a final order or judgment under this Act."

In *Roth v. Roth* (1977), 52 Ill. App. 3d 220, 227-28, the court held:

> "*** Allowance of attorney's fees, however, in post-decree proceedings concerning the custody and maintenance of children is within the sound judicial discretion of the trial court and depends upon the particular circumstances of the individual case. [Citation.] The court looks to the relative financial position of the parties, and the party seeking attorney's fees must show financial inabil-

ity to pay and the ability of the other spouse to do so. [Citation.] A further consideration is the identity of the party who precipitated the need for the current legal fees. [Citations.]"

In the instant case, Claudia alleged in her petition for attorney fees that she was earning approximately $155 per week and that she had insufficient funds to pay the balance of her attorney fees. She had paid $10,000 of the fees, leaving a balance of $8,197. Claudia further alleged that Jackie was "gainfully employed as a musician and earns substantial income from said employment" and, therefore, should be ordered to pay her attorney fees. The only evidence in the record regarding Jackie's income was testimony that he had made $12,000 in the year preceding the hearing, but expected to earn $25,000 in the next year.

We do not believe that Claudia sustained her burden of proof to demonstrate that she was financially unable to pay her own attorney fees or that Jackie was financially able to pay them. It should be noted that Claudia is the party that precipitated the need for the current legal fees. If Claudia had not allowed the serious physical abuse of her daughter while the child was in her custody, then Jackie Cotton would not have had to secure an emergency transfer of custody or seek permanent custody.

We believe the case of *Kuhns v. Kuhns* (1972), 7 Ill. App. 3d 884, is dispositive of the instant case. In *Kuhns,* the custody of the couple's four minor children was awarded to the mother. The father petitioned the court for a modification of the custody order, alleging that the mother of the children had, together with another person who was a fugitive from justice, taken the children from Chicago. He further charged that the mother habitually committed adultery, that she abandoned the children and was violent to them, that she was addicted to pills of a dangerous nature, that she was habitually intoxicated, and that she attempted to commit suicide. The court held:

"In determining whether an allowance of fees is proper, it is necessary to examine the circumstances which initiate the invocation of judicial proceedings for relief. (*Cimino v. Cimino,* 93 Ill. App. 2d 412, 236 N.E.2d 299.) *And where the party upon whom the fees are sought to be imposed has done nothing which necessitated or required judicial action, the allowance of fees is error. Moore v. Black,* 10 Ill. App. 2d 339, 134 N.E.2d 347.

It is clear that plaintiff, by her own misconduct, precipitated these post-decree proceedings. \* \* \* Although the record reveals that defendant is possessed of more income and assets than plaintiff, we believe that it would be inequitable and unfair to further punish defendant by requiring him to pay fees to plaintiff's attorneys." (Emphasis added.) 7 Ill. App. 3d 884, 886.

While we agree that an award of attorney fees rests within the sound discretion of the trial judge and will not be disturbed absent an abuse of that discretion, under the particular circumstances of this case, it would be inequitable to require Jackie to pay Claudia's attorney fees. Jackie rescued Christy from a dangerous environment and acted in her best interests. If we were to now require him to pay Claudia's fees, we would in essence be punishing him for Claudia's neglect.

We therefore conclude that the decision of the trial judge regarding Christy's custody was not against the manifest weight of the evidence, and therefore we affirm the judgment of the circuit court as to custody. Jackie Cotton should have custody of Christy with liberal visitation rights for Claudia, as set forth in the order of the trial court. We reverse both that portion of the appellate court's order that awarded custody of Christy to Claudia and the circuit court and appellate court judgments holding that Jackie should pay $8,197 of Claudia's attorney fees.

*Appellate court reversed; circuit court affirmed in part and reversed in part.*