2022 IL App (1st) 211620-U

FIRST DISTRICT,
FIRST DIVISION
May 16, 2022

No. 1-21-1620

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| IN RE THE MARRIAGE OF: | ) | Appeal from the |
| | ) | Circuit Court of |
| MATTHEW JAGER, | ) | Cook County, Illinois. |
| | ) | |
| Petitioner-Appellee, | ) | No. 19 D 10091 |
| v. | ) | |
| | ) | |
| BEI ZHANG, | ) | Honorable |
| | ) | Naomi H. Schuster, |
| | ) | Judge Presiding. |
| Respondent-Appellant. | ) | |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Justices Pucinski and Walker concurred in the judgment.

**ORDER**

¶ 1   *Held*: In dissolution proceedings, trial court's order granting relocation of the minor children to Arizona was not against the manifest weight of the evidence.

¶ 2   In 2019, petitioner Matthew Jager filed a petition for dissolution of marriage against respondent Bei Zhang. On December 14, 2021, the trial court granted Matthew's petition to permanently relocate the parties' two minor children to Arizona. Bei filed an interlocutory appeal pursuant to Supreme Court Rule 304(b)(6) (Ill. S. Ct. R. 304(b)(6) (eff. Mar. 8, 2016); see also *In*

*re Marriage of Fatkin*, 2019 IL 123602, ¶ 27 (order granting relocation petition immediately appealable under Rule 304(b)(6)). For the reasons that follow, we affirm.

¶ 3                                   BACKGROUND

¶ 4        Matthew and Bei were married on March 9, 2009. They have two children of the marriage, a son born in 2014 ("Ma") and a daughter born in 2016 ("Mi").[1] Prior to the instant proceedings, the family resided in Chicago.

¶ 5        On December 2, 2019, Matthew filed a petition for dissolution of marriage. On March 6, 2020, while the proceedings were pending, Matthew and the children traveled to Arizona for a planned 11-day vacation. On March 10, Matthew filed a notice of intended relocation in which he stated that he intended to permanently move to Phoenix, Arizona with the children and requested that Bei agree to the relocation without court action (see 750 ILCS 5/609.2 (West 2018)).

¶ 6        Bei did not agree, and on March 16, Matthew filed an "Emergency Motion to Allow Matthew and the Minor Children to Remain in Arizona During the COVID-19 Outbreak," arguing that flying back to Chicago during the pandemic would put the children's health at risk, whereas Arizona was a safer place to "wait out the outbreak." On March 17, the trial court granted Matthew's motion and ordered that the children stay in Arizona until further order of court, but stated that its order was entered without prejudice to any party and "shall not be deemed any basis for temporary or permanent relocation."

¶ 7        On April 6, by agreed order, Steven Wasko was appointed guardian *ad litem* under section 506(a)(2) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/506(a)(2) (West 2018)) to investigate child-related issues, including relocation. On May 13, the

---

[1] For privacy purposes, and because the children have the same initials, we refer to them as "Ma" and "Mi."

trial court ordered Matthew to return to Chicago with the children on or before June 1, and ordered that Bei be given primary care of the children for the month of June.

¶ 8    On July 2, 2020, the trial court appointed Dr. Phyllis Amabile to conduct an evaluation under section 604.10(b) of the Act (750 ILCS 5/604.10(b) (West 2018)) regarding allocation of parental responsibility, parenting time, and relocation of the children to Arizona. Dr. Amabile published a report on September 15 advising against relocation, the details of which shall be discussed below.

¶ 9    On October 14, Matthew was granted leave to appoint Dr. David Finn as a retained evaluator under section 604.10(c) of the Act (750 ILCS 604.10(c) (West 2018)). Dr. Finn published a report on April 11, 2021 stating that relocation to Arizona was in the children's best interests. Two days later, on April 13, 2021, Matthew filed the petition for relocation that is the subject of the instant appeal.

¶ 10                              Dr. Amabile's Report

¶ 11   Dr. Amabile based her report on interviews and supplemental records provided by the parties, interviews with the children, and medical records.[2] She stated that after Matthew and Bei's marriage in 2009, they initially lived in Indiana before moving to Chicago in 2012 because Bei's employer, Burberry, wished her to open a store there.

¶ 12   In 2014, Ma was born with multiple medical conditions: imperforate anus (*i.e.*, he lacked a functioning anus), VSD (ventricular septal defect or a "hole in the heart"), and hydronephrosis (kidney malformation). Matthew told Dr. Amabile that he stopped working to take care of Ma and the household full-time, and that "he and his wife agreed to this arrangement, and she urged him to do it." Bei, on the other hand, stated that Matthew's joblessness was an ongoing area of

---

[2] Although Dr. Amabile's report was admitted into evidence, she was not called to testify at trial.

disagreement between them, and Ma was largely cared for by Bei's mother, daycare workers, and in-home teachers and nannies.

¶ 13    Mi was born healthy in 2016. As for Ma, he underwent multiple major operations before the age of three, including an operation to create an anus and another to connect his lower intestine to the anus. He has some sphincter control but cannot hold stool in a normal fashion. He wore diapers until March 2019, when Matthew and Bei, under the counsel of Ma's medical providers, started using a high-volume enema on him every morning. This daily enema routine takes 70 to 90 minutes and completely evacuates his bowels, enabling him to remain continent for the next 24 hours and attend school out of diapers.

¶ 14    In the second half of 2019, Ma started acting aggressive and uncooperative at school and at home, having angry, screaming meltdowns. In November 2019, according to Matthew, Ma threatened to kill all three family members in their sleep and stick needles in them. (Bei was not present for Ma's alleged comments.) The next morning, Matthew found a needle had been placed in his shoe and arranged to pierce his foot. At the advice of Ma's therapist, Dr. Yael Zahtz, Matthew enrolled Ma in the Compass partial hospitalization program (PHP) for intensive behavioral therapy. Ma was admitted to Compass on December 2, 2019, the same day that Matthew filed for divorce.

¶ 15    Dr. Amabile reported that Matthew has multiple parenting strengths: he took primary responsibility over Ma's medical care, and he is organized, precise, and detail-oriented, with excellent teaching skills. He also has multiple shortcomings: he is rigid and inflexible, and in an interview with Dr. Amabile, Ma described him as "mean" and "rude." Despite his education and high intelligence, he "has not earned much income" since the parties' marriage; Matthew admitted his income was "very low" from 2014 to 2020, peaking at $7000 in 2017.

¶ 16    As for Bei, her strengths are that she is a hard worker, personable and likable, who displays love and affection for the children and has a "close emotional tie" with them. Contrary to Matthew's assertions, Dr. Amabile found that Bei was not an uninvolved, absent, or disconnected parent. (In this regard, Dr. Amabile observed that both parents sometimes distorted and told falsehoods about the past.) As for Bei's shortcomings, Dr. Amabile observed that Matthew, not her, was in charge of the hands-on day-to-day care of the children. In July 2019, when Matthew took a three-and-a-half-week vacation to Africa and left the children in Bei's care, she was "quite overwhelmed." However, Dr. Amabile opined that she had significantly improved her parenting skills since then.

¶ 17    Matthew had four arguments in favor of relocation: better medical care, better schools, proximity to extended family including the children's three young cousins, and the fact that he had an $80,000 job offer in Phoenix.[3] Dr. Amabile opined that the move would enhance "aspects of" Matthew's and the children's lives, but "not greatly," and not sufficiently to overcome "the substantial detriment to the children of being far from ample, frequent time in their mother's care." She found that the children have "a close and essential emotional tie" to Bei that could not be adequately maintained through long-distance visitation.

¶ 18    Accordingly, Dr. Amabile recommended that the relocation petition be denied and that the parents continue to share parenting time equally on a five-five-two-two-day schedule, which was preferable to a seven-seven-day schedule because it would decrease the periods of time in which the children would not see each parent. She recommended that the summer parenting schedule be structured to allow Matthew and the children to "spend some extended time in Arizona with his family of origin."

---

[3] By the time of trial, the $80,000 offer had apparently been withdrawn, but Matthew had received a $65,000 job offer from a different employer.

¶ 19                                    Dr. Finn's Report

¶ 20         Dr. Finn found that "both parents are well bonded to both children and clearly have an abundance of love for them." Prior to the parties' separation, Matthew was the children's primary caretaker because he stayed at home while Bei worked. This did not reflect any unwillingness or inability on Bei's part, and her involvement in the children's care increased after the parties separated. "Both parents are effective in their parenting skills," although Matthew "can be rigid" and had difficulty appreciating that Bei's opinions and practices could be different from his without being wrong. As for Bei, she was willing to learn and adapt, but Dr. Finn observed that she "subtly triangulates" the children into taking her side over Matthew's, and she "has been challenged by the children's behavior." Since Bei was more emotionally expressive than Matthew, her frustration was more visible, as seen in an incident in which Bei smashed Ma's iPad "in a fit of anger."

¶ 21         Regarding the pros and cons of relocation, Dr. Finn stated that Matthew had identified three possible schools in Arizona, all of which would be "well-suited for the children's needs." Ma attended Ogden School in Chicago, which was also "well-suited for [his] needs," although all his classes were remote due to the COVID-19 pandemic. Dr. Finn observed that neither child has any "significant social or extracurricular activities" in Chicago due to their age and the pandemic. Ma identified friends in Chicago, while Mi did not; however, the children also had relationships with their extended family in Arizona. Dr. Finn concluded that the children have "social capital in both locations."

¶ 22         Dr. Finn identified two factors favoring relocation. In Arizona, Matthew's extended family could help with Ma's care. Matthew's father, Dr. Rama Jager, was a retired surgeon with specific knowledge of Ma's condition; Matthew's mother, Patricia Jager (Patricia), was a trained

nurse; and Matthew's sister was a physician. Additionally, Matthew's house in Arizona (unlike Bei's studio apartment in Chicago) had multiple bathrooms, which would be beneficial to Mi if she needed to use the bathroom during Ma's daily enema routine.

¶ 23    However, Dr. Finn was concerned that relocation "may have the unintended consequence of disrupting [the children's] relationship with Bei," which could not be adequately maintained through telephone and video contact. He was uncertain whether Bei would have the financial resources to regularly visit the children in Arizona. He noted that Matthew said he "might well" move to Arizona regardless of the court's decision, while Bei said that if relocation was granted she would move to Arizona because she "would not leave the children."

¶ 24    Dr. Finn concluded that "two viable options exist, each with costs and benefits" and "[w]hile the children would do well in either scenario, I believe the better one involves relocation." He cited Matthew's traditional "lead role" as a parent, the presence of Matthew's extended family who could help with Ma's care, and Matthew's large home with multiple bathrooms. He also stated that Matthew was "much less reactive to Bei than she is to him" and would more likely facilitate Bei's relationship with the children in a relocation scenario than the other way around. Finally, he stated that the "ideal scenario" would be if Bei moved to Arizona with the children, which he opined might be possible since Bei conducted her business primarily online.

¶ 25                                      Trial

¶ 26    The trial on Matthew's relocation petition took place over eleven days between June and November 2021.

¶ 27    Dr. Jager, Matthew's father, testified that he is a board-certified colorectal surgeon and owns a medical practice dealing with diagnosis and treatment of colon and rectal problems. Ma's

condition of imperforate anus is incurable and requires long-term medical and surgical care. Dr. Jager and his wife Patricia, a certified enterostomal therapist, were at the hospital when Ma was born and were the first to notice that he lacked an anus. With no way to empty the contents of his colon, he was at risk of a colon rupture. Dr. Jager discussed options with a pediatric surgeon who performed a colostomy on Ma the same day to create a "vent" for the colonic contents. Dr. Jager helped care for the colostomy site to avoid skin damage. Dr. Jager was also present for Ma's anoplasty and pull-through surgery (to create an anus and link it to his intestine) and discussed the procedures pre-operatively with the surgeons. When Ma began his daily enema routine, Dr. Jager "[o]ften" helped with the procedure when he was in Chicago and also instructed Matthew on ways to increase the procedure's efficacy. "Until recently," Matthew and Bei would contact him for "just about every and any medical issues that [Ma] was facing."

¶ 28        Dr. Jager opined that it would benefit Ma to live in Arizona because Dr. Jager could physically examine him, coach him on clinical biofeedback techniques to constrict his anal sphincter (over which his control is weak), and advise him on his diet to avoid constipation and fecal impaction. Dr. Jager further stated that Phoenix Children's Hospital had an "excellent" reputation among colorectal surgeons. PCH takes special interest in the psychosocial aspects of anorectal malfunctions, with support groups and workshops where a child psychologist gives advice to patients and their parents. Dr. Jager opined that while Lurie Children's Hospital in Chicago was a good hospital, PCH had a better program for Ma.

¶ 29        Dr. Jager stated that he "ha[s] nothing against Bei" and, on the occasions he saw her together with the children, their relationship seemed "fairly decent." If relocation was granted, he would help facilitate her relationship with the children (though he was "not sure" that facilitation

was necessary since the bond was "already there"). If, after the divorce, Bei contacted him with a concern about Ma's care, Dr. Jager would "[a]bsolutely" help her.

¶ 30    Stephanie Walaszek, the director of account services at OH Partners, a Phoenix-based advertising agency, testified that Matthew worked as an independent contractor doing copywriting services for the agency. In May 2021, Walaszek offered him a full-time position as senior copywriter. The position typically paid $65,000 a year with benefits and flexible scheduling; employees could work remotely but were required to live in Arizona. The position was not created solely for Matthew and would ideally need to be filled (by Matthew or someone else) within three months.

¶ 31    Dr. Finn testified, consistently with his report, that he recommended relocation to Arizona based on multiple factors: Matthew was the children's primary caretaker, taking the lead role in Ma's medical care and in pursuing mental health treatment, education, and extracurricular opportunities for him. Matthew had extended family in Arizona, including his parents and his sister, who had three children around the same age as Ma and Mi. Bei, on the other hand, had no family in the Chicago area; both her parents resided in China. Although Lurie Children's Hospital and Phoenix Children's Hospital were medically comparable, Dr. Finn believed that PCH was superior "from a psychosocial perspective."

¶ 32    Bei had expressed concern to Dr. Finn that if relocation were allowed, Matthew's parents might alienate the children from her, but after interviewing Matthew's parents, Dr. Finn did not perceive any risk of potential alienation. Conversely, he expressed concern about Bei's ability to facilitate the children's relationship with Matthew if relocation was denied, since she "harbors a lot of anger" toward Matthew and "was much more reactive to Matt than Matt was to her." He cited an incident after the parties' separation where Bei involved the children in a decision to rent

a new apartment in Chicago, got Mi excited about the swimming pool, and told the children to keep the apartment a secret from their father. Bei also told the children that Arizona was "not as nice" as Chicago and that she was "not invited" to Arizona, and during one observation session with Dr. Finn she had Ma recite a list of Chicago-area people to whom he was attached.

¶ 33     Nevertheless, Dr. Finn believed that Bei was a good, loving mother. The loss of either parent would impact the children significantly, and it would be best for them if both parents lived in the same area. He "hope[d]" that if Bei decided to move to Arizona, Matthew or his family would assist her financially until she could provide for her own housing.

¶ 34     Matthew testified that when Ma was born in 2014, he was earning $35,000 a year as an editor for Mandarin Weekly, while Bei earned around $80,000 a year with Burberry. Matthew left his job because he could not balance work with his obligations as a father, and he and Bei agreed that she had more earning power. Prior to filing for divorce, Matthew's role in the family was to care for the children and manage the household. His duties included taking Ma to doctors' appointments, conducting his daily enema routine, managing the children's diet (the children have many food allergies, including wheat, dairy, and nuts, and Ma also requires a strictly managed diet to avoid constipation), researching and hiring in-home teachers before the children reached kindergarten age, and researching schools for them.

¶ 35     In August 2019, Matthew and Bei first discussed the possibility of moving to Phoenix. At the time, Bei was running a secondhand luxury handbag business called Sincerely Bei, and she suggested she could "bounce around the country hosting pop-up shops" while Matthew "h[e]ld down the fort" with the children in Phoenix. Over the next several months, Matthew and Bei continued to discuss the possibility of moving, "researching stores, locations, neighborhoods, [and] markets." On December 1, 2019, the day before Matthew filed for divorce, he had a

conversation over texts with Bei, who was taking a trip to China. Matthew had already informed Bei that he would be filing for divorce. Bei said that she had been collecting information from customers in Phoenix and "if [moving to Phoenix] is the only option, I will be there to support you and the family." Sometime in December 2019, Bei changed her mind about being willing to move.

¶ 36        Matthew said that he wanted to move to Phoenix for increased professional opportunities, better medical care for Ma, "[t]he best schools in the country," and proximity to family with medical training. If relocation was denied, he would still move to Phoenix because the cost of living was lower and he could obtain full-time employment to financially support the children's medical and educational needs (in particular, sending the children to private schools with better student-teacher ratios and gifted programs). He could not find work in Chicago because he had a seven-year gap in his resume and no professional connections, and it was difficult to find a job that would allow him to continue caring for the children. In Arizona, his sister, who worked in public health, had professional connections which would allow him to "get a foot in the door."

¶ 37        As for Bei, Matthew claimed that she could conduct her handbag business in Phoenix because her online customers were not exclusive to the Chicago area, but Bei did not want to move because "she's a big-city girl and wants an Instagrammable Sex in the City lifestyle." Although Bei feared he would alienate the children from her, Matthew denied he would do such a thing. On the other hand, he was concerned that Bei would alienate the children from him if relocation was not granted. On multiple occasions she said he was not a good father in front of the children, and she made negative comments about him to the children's medical and educational providers. During her custody weeks, she did not facilitate the children's daily call with him; the children were often "subject to avoidable distractions" such as television and video

games, or they were unavailable at the scheduled time. It was "challenging" to communicate with Bei about child-related issues because she often ignored or belittled him. He cited multiple exchanges on OurFamilyWizard (OFW), a co-parenting app, where he asked questions about the children's care and Bei gave unclear answers or did not respond.

¶ 38        Matthew cited multiple concerns over Bei's parenting. Bei had a "violent temper"; in October or November 2019, she smashed Ma's iPad in front of him because he did not come to the breakfast table on time. For the 2020-21 school year, Bei enrolled Ma in Ogden School, a public school with no gifted program, without Matthew's knowledge or consent, even though Matthew had told Bei he did not think Ogden was the best option. Bei did not inform the school of Ma's medical condition or seek accommodations for him (*e.g.*, unrestricted bathroom access, permission to keep a spare set of clothes in the nurse's office, and extended test-taking time if needed due to his symptoms); Matthew had to contact the school in October 2020 to set up an accommodation plan. In September 2020, when the children were in Bei's care, Mi had a severe allergic reaction to a dumpling containing wheat. Bei did not inform Matthew of this incident, and when Matthew found out about it from the children and asked Bei what had happened via OFW, she refused to explain.

¶ 39        Bei testified that she never agreed to Matthew's decision to stop working after Ma was born. She said it was not necessary for him to be a stay-at-home parent since they had a full-time teacher at home, and throughout their marriage she encouraged Matthew to obtain employment. She denied that Matthew was the children's primary caretaker, stating that they shared parenting duties equally prior to their separation. Matthew made most decisions regarding the children because he was controlling and very particular about how he wanted things done and it was easier to agree with him to avoid fighting. She acknowledged that while Matthew was on

vacation in Africa in July 2019, she sent him numerous texts about the children's care, asking whether a particular bottle was Ma's glycerin, how to operate Mi's nebulizer, and the name of Ma's allergist, and stating that managing the children's bedtime routines was "the hardest thing [she had] ever done in her life."

¶ 40       In August 2019, Matthew and Bei discussed moving to Arizona. Matthew wanted to move; Bei did not, but she did not reject the idea because she was "trying to save [the] marriage" and felt guilty about having feelings for another man.

¶ 41       Initially, after Matthew filed for divorce, they shared the marital residence. Bei would live there during her weeks with the children, and during off-weeks she would live in her own studio apartment. In August 2020, during one of her custody weeks, she received an eviction notice signed by Dr. Jager directing her to leave. After that, she brought the children to stay with her at her apartment, which was small and had only one bathroom (unlike the marital residence, which had three). Since then, she has moved into a larger apartment with two bathrooms. Her mother is currently visiting from China on a six-month visa and takes care of the children while Bei is at work.

¶ 42       Bei stated that Matthew believed no schools in Chicago were good enough for Ma and would not consent to Ma attending any of them; he was waiting for the court's relocation order so he could enroll Ma in an Arizona school. Bei believed that it was important for her son to be in school, so she unilaterally enrolled him in Ogden for the 2020-21 school year. Although Matthew recommended MAGE, a private school for gifted students, Bei did not choose that school because it was costly ($2400 per month), was not in their neighborhood, and did not offer Chinese classes. Bei stated that she did not inform Ogden of Ma's medical condition because all

his classes were remote. She intended to tell them before Ma took any classes in person, but Matthew told them first.

¶ 43    Bei denied withholding medical information about the children from Matthew. She did not always respond to his questions on OFW because English was not her first language and she was afraid that he would twist her words and use them against her in court. She preferred to explain things to him over the phone, or discuss them when dropping off or picking up the children. She was not aware of any court order requiring them to correspond solely through OFW.

¶ 44    During Bei's parenting weeks, the children have a daily phone call with Matthew at 5 p.m. Bei stated that this time is not always convenient if the children are enjoying themselves outdoors, and she would prefer to be flexible about timing; she will call Matthew, explain the situation, and tell him that the children will call later. She related an incident in August 2020 in which she and the children were on a planned kayaking trip when Matthew called at 5 p.m. Bei told Matthew that he was endangering the children's lives by insisting on having his parenting time while they were kayaking and she would call back later. That night, she called him multiple times, but he did not pick up. Bei additionally said the children are sometimes distracted during the daily call because they are young and have trouble staying focused. This was a greater issue in her studio apartment, but now that she has moved into a larger apartment where the children can take calls in their bedroom by themselves, there are fewer distractions.

¶ 45    Bei acknowledged having problems with her temper, but she was undergoing therapy with Dr. Zahtz to learn to be a better parent and a better coparent with Matthew. In 2019, she broke Ma's iPad because he would not put it away to eat breakfast, but she immediately realized

it was a "horrible" thing to do and apologized to him. She has not broken anything else since then.

¶ 46    Bei believed that Matthew wanted to relocate the children to Arizona to hurt her and to be closer to his family. She opined that relocation would be against the children's best interests for several reasons. First, it would interfere with their routines and the stability of their lives. Second, Ma would need to get a new medical team and a new therapist when he was comfortable with his current one. Third, she was uncertain whether she would be financially able to visit the children regularly in Arizona. Although Dr. Finn recommended that Matthew pay for her airfare, lodging, and rental car, Matthew did not have enough money for that, and his parents had withheld money from her in the past. Fourth, Patricia sent a letter to Dr. Amabile in which she wrote "horrible lies" about Bei. If the children were in Arizona, Patricia might say the same things to them and alienate them from her. Fifth, although Dr. Jager's presence was "a real bonus," Bei was concerned that if the family displeased him, he might withdraw his financial support, causing Matthew to lose the house and her children to be "throw[n] on the street." Bei acknowledged that she had a positive relationship with Matthew's parents before they evicted her from the marital residence.

¶ 47    Asked whether she would move to Arizona if relocation was granted, Bei said, "I don't know." Her job, her clientele, her friends, and her boyfriend were all in Chicago. She explained that her online handbag business "faded away" in early 2020, and she got a full-time job at Montcler in May 2021. If relocation was denied, she proposed that Matthew could fly to Chicago to visit the children once a month, and they could split holidays and summer and winter vacations equally.

¶ 48       Alison Osborne, an advanced practice nurse working in the colorectal center at Lurie Children's Hospital, testified that Ma has been her patient since shortly after his birth. Ma's appointments are currently every three to four months, spaced out because he has been doing "very well." Both parents have been trained in administering his enemas, and she has no concerns that either parent cannot perform them properly.

¶ 49       Osborne stated that Lurie does not organize support groups for colorectal patients, but they maintain a list of family-run support groups throughout the country, and, on request, they can connect families whose children have gone through similar situations. Although Lurie's bowel management clinic does not provide mental health support, they can refer patients to psychologists who specialize in working with patients with bowel issues. Lurie also runs a one-week summer day camp for patients who are transitioning from a daily enema routine to an oral laxative routine (as Ma will likely do in the future), although this is typically a one-time camp unless "they don't do well one year, then they resume their current regimen, and we try again another year."

¶ 50       Maya Johnson was the full-time in-home educator for Ma and Mi from fall 2018 to summer 2019. She worked from 8 a.m. to 4 p.m. When she arrived in the morning, Bei would generally be in the kitchen, finishing up breakfast with the children, while Matthew would be heading to his home office. During the day, Bei would come home to have lunch with the children; Matthew did not join them but ate in his office. Bei returned home from work shortly before 4 p.m. If she got off work early, she would relieve Johnson early (with full pay) so that she could do things with the children.

¶ 51       Johnson sent her lesson plans to Matthew and Bei. Both parents were very involved in giving input. Matthew additionally gave her a "caregiver handbook" with the children's dietary

needs, allergies, and contact numbers, plus a daily spreadsheet to record what the children ate and what was accomplished in their lessons. Johnson regularly uploaded photos of the children and comments on their activities via the Tinybeans app, and Matthew and Bei could comment and post their own photos. Bei would comment on almost every photo "and tell me *** why she loved this or if the kids were still talking about it."

¶ 52    Wasko, the GAL, gave an oral report to the court in which he recommended against relocation. He found that before the parties' separation, Matthew was not the children's primary caretaker; he spent most of his days in his office with the door closed while nannies and teachers took care of the children. He was traditionally in charge of medical decisions and the children's medical care, while Bei only started medically caring for Ma after the divorce proceedings began, but she has "done very well." Both parents "are gravely concerned about their children *** [and] both want to maximize their time with their children," and the loss of either parent would impact the children. The relocation petition was "very unfortunate" since the current parenting schedule with both parents in Chicago "has operated basically without incident" and the children were adjusting well.

¶ 53    Wasko identified multiple factors in favor of relocation: the "very large expensive home" gifted to Matthew by his father, and the presence of extended family, especially Dr. Jager, to help with the children's care. He opined that the children's life in Phoenix would be "fairly utopic." However, Wasko found these factors were outweighed by others: First, he was skeptical that Matthew, with his $65,000 a year job, would be able to pay for Bei to come visit the children on a regular basis. Second, Ma "has had a very difficult life up until now" and the loss of his mother would be a "great concern." Third, Matthew claimed to be concerned that Bei would endanger the children's health by neglecting their medical care, but he also testified that if

relocation was not granted, he would move to Arizona by himself and leave the children in Bei's care. Wasko found this "troubling" and it led him to "question [Matthew's] real motives and his care about the children." Thus, Wasko recommended that relocation be denied. He hoped that Matthew would remain in Chicago with the children, but "if he makes that decision to step out of the children's lives, that's a decision that he's making."

¶ 54    On cross-examination by Matthew's counsel, Wasko acknowledged that certain of Bei's actions—not facilitating electronic parenting time with Matthew, unilaterally enrolling Ma in Ogden School, hiring a nanny without Matthew's knowledge, and speaking negatively about Matthew to medical providers and school officials—were concerning, but he believed Bei had "learned [her] lesson" and would not engage in those behaviors in the future.

¶ 55                                   Ruling

¶ 56    Following closing arguments, the trial court stated that the case was a "very close call" and that both parents had "significant credibility issue[s]" in testifying about the other parent. It found that Matthew's reasons for moving to Arizona were legitimate and that he "has been the structured parent, taking the lead on most, if not all, medical and educational decisions," but the children were "clearly bonded to both of their parents" and would suffer trauma if separated from either. The court stated that there were no significant differences between Chicago and Arizona in terms of educational opportunities or medical care, though it was "more impressed" with PCH's program relating to "total care" outside of Ma's physical medical condition. The presence of Matthew's parents in Arizona weighed in favor of relocation, since they "have been involved in [Ma]'s care through the entirety of his lifetime," and the children had "close bonding" with Matthew's family in the Phoenix area. Finally, there was no extensive testimony

regarding the children's bonding to school programs or extracurricular activities in the Chicago area.

¶ 57        Weighing these factors, the trial court granted Matthew's relocation petition "with a great deal of reluctance but hope for the future." The court ordered the parents to continue to make joint decisions regarding the children and granted Bei parenting time "every Thanksgiving break, one half of the winter break to be alternated, every spring break, and all summers" at Matthew's expense, as well as "one weekend per month in Arizona" at Bei's expense. The court also specified a return to 50/50 parenting time if Bei moved to Arizona.

¶ 58                                    ANALYSIS

¶ 59        A party filing a petition for relocation must prove by a preponderance of the evidence that it is in the children's best interests. *In re Marriage of Kavchak*, 2018 IL App (2d) 170853, ¶ 65. In ruling on a relocation petition, the trial court must consider the following factors:

"(1) the circumstances and reasons for the intended relocation;

(2) the reasons, if any, why a parent is objecting to the intended relocation;

(3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;

(4) the educational opportunities for the child at the existing location and at the proposed new location;

(5) the presence or absence of extended family at the existing location and at the proposed new location;

(6) the anticipated impact of the relocation on the child;

(7) whether the court will be able to fashion a reasonable allocation of parental

responsibilities between all parents if the relocation occurs;

(8) the wishes of the child, taking into account the child's maturity and ability to

express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate

to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a

parent's relocation; and

(11) any other relevant factors bearing on the child's best interests." 750 ILCS

5/609.2(g) (West 2018).

These factors are not applied rigidly but considered on a case-by-case basis in light of all

relevant facts and circumstances. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32. Since the trial

court is in the best position to evaluate the parents' temperaments, personalities, and capabilities,

as well as their credibility, we will not reverse its decision unless it is against the manifest weight

of the evidence. *Kavchak*, 2018 IL App (2d) 170853, ¶ 65; *In re Marriage of Cotton*, 103 Ill. 2d

346, 356 (1984).

¶ 60         Here, multiple factors supported relocation. Matthew has extended family in Arizona,

including his father, Dr. Jager, a colorectal surgeon with extensive experience in treating Ma's

rare medical condition. The trial court found that Dr. Jager and his wife, a trained nurse, "have

been involved in [Ma's] care through the entirety of his lifetime." Dr. Jager gave detailed

testimony as to how it would benefit Ma to live in Arizona because he could physically examine

him and coach him on biofeedback techniques. There was no significant testimony about

extended family residing in the Chicago area. Although Dr. Jager has one son in Illinois, that son

is estranged from the family and Bei testified she has no contact with him. Bei's parents are both residents of China. At the time of trial, Bei's mother was in the United States on a temporary visa and was helping with the children's care, but her future availability was uncertain.

¶ 61        Moreover, although the court found "no significant difference between the medical care that is available to the children in Phoenix or Chicago," it also stated: "This Court is more impressed with the Phoenix Children's Hospital program as it relates to the totality of the care outside of just the physical medical condition that [Ma] experiences." This conclusion was well supported by the record. Dr. Jager testified that PCH specializes in the psychosocial aspects of treatment, providing support groups and workshops with a child psychologist. By contrast, Lurie does not organize support groups, though it has a list of outside support groups that it provides to patients on request.

¶ 62        Additionally, Matthew had a $65,000 job offer in Arizona that would allow remote work and flexible scheduling for the sake of the children. There was ample testimony about the parties' financial struggles after their separation. Matthew "suffer[ed] from chronic underemployment" in Chicago because of the gap in his resume and his lack of professional connections, but his sister's professional connections in Arizona allowed him to get his "foot in the door." As for Bei, her handbag business "faded away," with her last sale being in early 2020. She got a job with Carlisle on Oak Street in early 2020, but she was furloughed due to the pandemic and did not obtain her current job with Montcler until May 2021. One of her reasons for unilaterally enrolling Ma in Ogden for the 2020-21 school year was the high cost of the private school recommended by Matthew. Under these facts, Matthew's job offer in Arizona weighs in favor of relocation. See *In re Marriage of Pfeiffer*, 237 Ill. App. 3d 510, 513 (1992)

(petitioner's higher-paying job with the chance for advancement in Maryland weighed in favor of relocation).

¶ 63     Bei asserts that Matthew's claimed desire to support his family with his job in Arizona is not legitimate, since his testimony about his efforts to find work in Chicago was "evasive and less than compelling." However, the trial court made a credibility finding that Matthew's reasons for seeking relocation were legitimate, and we shall not disturb that finding on appeal unless it is against the manifest weight of the evidence. See *Cotton*, 103 Ill. 2d at 356. Bei also argues that $65,000 a year will not be sufficient to provide for Ma's medical expenses and the children's educational and extracurricular needs. Regardless, $65,000 is much higher than Matthew's income in Chicago; as noted in Dr. Amabile's report, his yearly income from 2014 to 2020 peaked at $7000 in 2017. Notwithstanding Bei's assertion that his "modest" income in Arizona will not adequately provide for the children, it is clearly better than the status quo.

¶ 64     Bei additionally argues that relocation will traumatize the children and disrupt their relationship with her, citing the statements of Dr. Amabile and Dr. Finn that the children's bond with Bei could not adequately be maintained through long-distance visitation. However, the trial court found that the children were "clearly bonded to *both* of their parents" (emphasis added) and the loss of either parent would be traumatic, whether they lived in Arizona apart from their mother or in Chicago apart from their father. Although Bei claims it is improper under the relocation statute to consider the impact on the children's relationship with Matthew if relocation is denied, our supreme court has made clear that the children's best interest is "paramount" and must be considered in light of all the circumstances of each case. *Fatkin*, 2019 IL 123602, ¶ 32. There was ample testimony at trial about Matthew's role as the children's caretaker and his

strengths (and weaknesses) as a father, which the trial court was certainly entitled to take into account.

¶ 65     Bei next argues that a reasonable visitation schedule cannot be achieved with the children living in Arizona while she lives in Chicago. But the converse is true if the children live in Chicago while Matthew lives in Arizona. Asked to propose a visitation schedule if relocation was denied, Bei suggested that Matthew be allowed to visit the children in Chicago once a month, and that they split holidays and school vacations—an arrangement that largely mirrored Matthew's proposed schedule if relocation was granted, but in reverse. The trial court acknowledged this difficulty in its ruling, stating that it was a "very troubling decision" and expressing a "firm belief" that 50/50 parenting time—an arrangement not possible with the parents living across the country from each other—would be in the children's best interest. In this regard, the trial court was entitled to take into account the fact that Matthew testified unequivocally that he would move to Arizona to accept the job offer regardless of the court's decision, while Bei was uncertain as to whether she would follow the children to Arizona if relocation was granted.

¶ 66     Finally, Bei argues that the trial court erred in rejecting the recommendations of Dr. Amabile and Wasko against relocation. It is well settled that a court is not bound to follow the recommendations of its appointed experts. *In re Marriage of Debra N. & Michael S.*, 2013 IL App (1st) 122145, ¶ 52; see also *In re Marriage of Saheb*, 377 Ill. App. 3d 615, 628 (2007) ("Nothing in section 604 requires the trial court to follow the advice of the 604(b) evaluator. Advice is simply that—advice. The trial court is the ultimate fact finder ***, not the expert witness."). Notably, Dr. Amabile did not consider the possibility of Matthew moving to Arizona without the children. In her report, she recommended a five-five-two-two-day parenting

schedule, which would clearly not be possible with Matthew in another state. Thus, she did not weigh the detriment to the children of being separated from Matthew if relocation was denied. As for Wasko, he acknowledged significant benefits to relocation, including the presence of Matthew's extended family and Matthew's large, expensive home, and he opined that the children's life in Phoenix would be "fairly utopic," although he ultimately recommended against relocation. The trial court carefully considered their opinions, as well as all the testimony in the eleven-day trial, before rendering a decision that was a "very close call." Though we agree with the trial court that this case is "very troubling" in light of the children's emotional ties to both of their parents, we do not find the trial court's finding that relocation is in the children's best interest to be against the manifest weight of the evidence.

¶ 67                                   CONCLUSION

¶ 68        The judgment of the trial court allowing relocation of the minor children to Arizona is affirmed.

¶ 69        Affirmed.